## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| SCOTT AUSTERMANN, MACKENZIE BEUTTEL, JENNIFER WERTHMANN, and JOHN WERTHMANN, <br><br> Plaintiffs, <br><br> vs. <br><br> SUBARU OF AMERICA, INC., a New Jersey Corporation, and SUBARU CORPORATION, a Japanese Corporation, <br><br> Defendants. | No. <br><br><br> **JURY TRIAL DEMANDED** <br><br> **CLASS ACTION** |

## CLASS ACTION COMPLAINT

Plaintiffs Scott Austermann, Mackenzie Beuttel, and Jennifer and John Werthmann ("Plaintiffs"), individually and on behalf of all others similarly situated (the "Class" as defined below), by and through their attorneys, allege as follows against Defendants Subaru of America, Inc. and Subaru Corporation (collectively, "Subaru"). Plaintiffs allege the following based on (a) personal knowledge, (b) the investigation of counsel, and (c) information and belief.

## SUMMARY OF THE ACTION

1.    Plaintiffs bring this action individually and on behalf of all current and former owners and lessees of the following model year ("MY") Subaru vehicles:

MY 2019-2021 Crosstrek, MY 2019-2021 Forester, MY 2019-2021 Legacy, and MY 2019-2021 Outback (the "Class Vehicles"). These vehicles suffer from a defect that results in thermo control valve failure (the "Thermo Control Valve Defect" or "Defect"), creating an increased risk of engine overheating and premature engine failure, ultimately resulting in unexpected engine and/or cooling system failure while operating the vehicle. The Defect renders the Class Vehicles inoperable, impairing their core functionality, and poses a safety hazard for drivers and their passengers who may be left stranded.  The Thermo Control Valve Defect manifests unexpectedly, requiring drivers to incur unforeseen expenses such as thermo control valve replacements, diagnostics, roadside services, and costs associated with securing alternative means of transportation.

2.     Subaru has been aware of the Thermo Control Valve Defect since at least 2021, when it updated the design of the thermo control valves following failures associated with the Defect. Subaru also knew of the Defect since large numbers of consumers complained about it, directly and indirectly to Subaru, including when they brought their Class Vehicles to Subaru's authorized dealers for repairs.

3.     Despite knowing of the Defect, Subaru has not successfully remedied it. The purported fix provided through Subaru's updated design has been ineffective. As a result, Plaintiffs and Class Members have been forced to pay out of pocket for replacements to their thermo control valve.

4.    While Subaru provides a three-year/36,000 mile Limited Warranty and a five-year/60,000 Powertrain Limited Warranty with each Class Vehicle, Subaru engages in a pattern and practice of avoiding its warranty obligations with respect to the Defect. When Plaintiffs and Class Members requested warranty service, Subaru representatives informed them that the necessary repairs to cure the Defect were not covered under warranty.

5.    The Defect renders the Class Vehicles unsuitable for their intended purpose—transportation. The Defect is substantially certain to manifest in the Class Vehicles.

6.    Because of the undisclosed Defect, Plaintiffs and Class Members were deprived of the benefit of their bargains in purchasing the Subaru vehicles at issue. Plaintiffs accordingly seek relief both for themselves and for owners or lessees of the Class Vehicles.

## **JURISDICTION AND VENUE**

7.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 of the Class Action Fairness Act of 2005 because: (i) there are 100 or more class members; (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs; and (iii) there is minimal diversity because at least one plaintiff and one defendant are citizens of different states. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C.

§ 1367.

8.     Venue properly lies in this judicial district pursuant to 28 U.S.C. § 1391 because Subaru is headquartered and regularly transacts business in this district, is subject to personal jurisdiction in this district and, therefore, is deemed to be a citizen of this district. Additionally, Subaru advertises in this district and has received substantial revenue and profits from its sales and/or leasing of Class Vehicles in this district; therefore, a substantial part of the events and/or omissions giving rise to the claims herein occurred, in part, within this district.

9.     This Court has personal jurisdiction over Subaru because it is headquartered in this judicial district, has conducted substantial business in this judicial district, and intentionally and purposefully placed Class Vehicles into the stream of commerce within New Jersey and throughout the United States.

## PARTIES

**Plaintiff Scott Austermann**

10.     Plaintiff Scott Austermann is a citizen and resident of Missouri.

11.     In or around May 2021, Plaintiff Austermann purchased a certified pre-owned 2020 Subaru Outback, bearing Vehicle Identification Number 4S4BTAEC3L3123007, from Lou Fusz Subaru, an authorized Subaru dealership located in St. Peters, Missouri.

12.     At the time of purchase, the Class Vehicle had approximately 27,000

miles on the odometer and was still covered under the manufacturer's original warranty.

13.    Prior to purchasing his Outback, Plaintiff Austermann viewed the Monroney sticker on the vehicle and spoke with Subaru sales representatives concerning the vehicle's features. Plaintiff relied upon the information provided to him during the purchase process because Subaru sales representatives had superior knowledge of the vehicle's features and condition.

14.    Neither Defendants nor their agents, dealers, or other representatives disclosed the Defect to Plaintiff before or after the time of purchase. Had they disclosed the Defect, Plaintiff would have reconsidered purchasing the Class Vehicle.

15.    In November 2023, the Defect manifested in Plaintiff's Class Vehicle. While driving, suddenly all the dashboard warning lights came on, indicating that the Class Vehicle was experiencing low oil pressure, low heat, and low water temperature. The vehicle could not be driven safely due to the high number of dashboard warning lights. The mileage of the Class Vehicle when the Defect manifested was approximately 79,000.

16.    Plaintiff Austermann contacted Lou Fusz Subaru to report the Defect and scheduled the earliest available appointment for service. Lou Fusz diagnosed the Class Vehicle with a failure of the thermo control valve. Lou Fusz informed

Plaintiff that the necessary repairs would not be covered under warranty.

17.    Plaintiff Austermann needed a working vehicle so he paid for the necessary repairs in the amount of $1,591.86.

18.    On November 14, 2023, Plaintiff Austermann contacted the Defendants' Customer Advocacy Department to request a reimbursement, but Plaintiff has not received reimbursement.

19.    At all times, Plaintiff Austermann has driven the vehicle for personal use, and in a foreseeable manner and in the manner in which it was intended to be used.

20.    Had Subaru disclosed the Defect to Plaintiff Austermann prior to purchase, including on the vehicle's Monroney sticker, he would not have purchased the Class Vehicle or would have paid less for it.

**Plaintiff Mackenzie Beuttel**

21.    Plaintiff Mackenzie Beuttel is a citizen and resident of Illinois.

22.    In May 2020, Plaintiff Beuttel purchased a new 2020 Subaru Legacy, bearing Vehicle Identification Number 4S3BWAC63L3021330, from Green Subaru, an authorized Subaru dealership located in Springfield, Illinois.

23.    Prior to purchasing her Legacy, Plaintiff Beuttel viewed Subaru advertisements and spoke with Subaru sales representatives concerning the vehicle's features. Plaintiff relied upon the information provided to her during the

purchase process because Subaru sales representatives had superior knowledge of the vehicle's features and condition.

24.    Neither Defendants nor their agents, dealers, or other representatives disclosed the Defect to Plaintiff before or after the time of purchase. Had they disclosed the Defect, Plaintiff would have reconsidered purchasing the Class Vehicle.

25.    In November 2023, the Defect manifested in Plaintiff's Class Vehicle. While driving on a busy road with her young child in the vehicle, the vehicle suddenly jerked forward, immediately slowed down and then sped up uncontrollably, and shortly thereafter became inoperable. After a tow truck brought the vehicle to Green Subaru, Green Subaru diagnosed the Class Vehicle with failure of the thermo control valve. The mileage of the Class Vehicle when the Defect manifested was approximately 70,000.

26.    Green Subaru informed Plaintiff that the necessary repairs would not be covered under warranty. Plaintiff Beuttel needed a working vehicle so she paid for the necessary repairs in the amount of $1,348.74.

27.    On November 17, 2023, Plaintiff Beuttel contacted the Defendants' Customer Advocacy Department to request a reimbursement. Defendants provided only a partial reimbursement of $600.00 for the amount paid in necessary repairs.

28.    At all times, Plaintiff Beuttel has driven the vehicle for personal use,

and in a foreseeable manner and in the manner in which it was intended to be used.

29.    Had Subaru disclosed the Defect to Plaintiff Beuttel prior to purchase, she would not have purchased the Class Vehicle or would have paid less for it.

**Plaintiffs Jennifer and John Werthmann**

30.    Plaintiffs Jennifer and John Werthmann (the "Werthmanns") are citizens and residents of California.

31.    In October 2023, the Werthmanns purchased a used 2020 Subaru Forester from Honda of Mission Valley, bearing Vehicle Identification Number JF2SKAXC1LH590886, an authorized Honda dealership located in San Diego, California.

32.    At the time of purchase, the Class Vehicle had approximately 34,000 miles; it was still under the manufacturer's original warranty.

33.    Prior to purchasing the Forester, the Werthmanns shopped at local Subaru dealers, test-drove approximately four Subaru Forester vehicles at those dealerships, viewed the Monroney sticker on the vehicles they test-drove, and spoke with Subaru sales representatives concerning the Forester's features. Neither Defendants nor their agents, dealers, or other representatives disclosed the Defect to Plaintiffs prior to or after the time of purchase. Plaintiffs relied upon the information provided to them during the shopping process because Subaru sales representatives had superior knowledge of the vehicle's features and condition.

Plaintiffs ended up purchasing their Class Vehicle because it fit their budget.

34.    Neither Defendants nor their agents, dealers, or other representatives disclosed the Defect to Plaintiffs during the shopping process. Had they disclosed the Defect, Plaintiffs would have reconsidered purchasing the Class Vehicle.

35.    Less than one month after Plaintiffs purchased the Class Vehicle, the Defect manifested. On November 5, 2023, the dashboard warning lights came on, indicating that the Class Vehicle was experiencing issues with the Subaru eyesight feature, automatic braking, and coolant levels.

36.    The next day, the Class Vehicle experienced the same issues from the previous day. The vehicle then went into limp mode and could not be driven.

37.    On November 9, 2023, Plaintiffs brought their vehicle to Subaru of El Cajon, an authorized Subaru dealership located in El Cajon, California. Subaru of El Cajon diagnosed the Class Vehicle with failure of the thermo control valve.

38.    Although, Subaru of El Cajon agreed to perform the necessary repairs under warranty, Plaintiffs were forced to pay a diagnostics fee and car rental fees while their Class Vehicle is being repaired.[1] Subaru of El Cajon informed Plaintiffs that it could be more than a month until Plaintiffs receive their vehicle.

---

[1] As of the date of this Complaint, Subaru of El Cajon has not performed the necessary repairs. Plaintiffs reserve the right to amend and/or supplement their allegations.

39.    As of the date of this Complaint, Subaru of El Cajon has not completed the necessary repairs, and thus Plaintiffs have incurred and continue to incur expenses related to the Defect, and are without the use of their Class Vehicle.

40.    Plaintiffs contacted the Defendants' Customer Advocacy Department to request compensation for car rental expenses. As of the date of this Complaint, Defendants have not rendered a decision regarding Plaintiffs' request.

41.    At all times, the Werthmanns have driven their vehicle for personal use, and in a foreseeable manner and in the manner in which it was intended to be used.

42.    Had Subaru disclosed the Defect to Plaintiffs prior to purchase, they would not have purchased the Class Vehicle or would have paid less for it.

**Defendants**

43.    Defendant Subaru Corporation (formerly known as Fuji Heavy Industries, Ltd.) is a Japanese corporation with its principal place of business in Tokyo, Japan. Subaru Corporation is engaged in the business of designing, manufacturing, warranting, marketing, advertising, selling, and servicing Subaru vehicles around the world, including through a network of more than 600 dealerships in the United States.

44.    Defendant Subaru of America, Inc. is a New Jersey corporation with its principal place of business in Camden, New Jersey. Subaru of America operates as a wholly-owned U.S. sales and marketing subsidiary of Defendant Subaru

Corporation. It distributes, advertises, markets, sells, warrants and services Subaru vehicles in the United States.

45.    The design, manufacture, distribution, service, repair, modification, and installation of the thermo control valves and related components within the Class Vehicles were controlled exclusively by Subaru Corporation, Subaru of America, and their agents and affiliates.

46.    There exists, and at all relevant times existed, a unity of ownership between Subaru Corporation, Subaru of America, and their agents such that any individuality or separateness between them has ceased and each of them is the alter ego of the others.

47.    Subaru of America communicates with Subaru Corporation concerning virtually all aspects of the Subaru products Subaru of America distributes, sells, warrants and services within the United States, including appropriate repairs for defects and whether Subaru will repair defective parts and assemblies.

48.    Subaru Corporation and Subaru of America jointly develop sales and marketing materials, advertisements, owner's manuals, warranty booklets, and maintenance recommendations and schedules for the Class Vehicles, as well as Technical Service Bulletins that Subaru issues to authorized dealerships in order to address known defects.

49.    Subaru Corporation and Subaru of America also jointly design,

determine the substance of, and affix to Subaru vehicles the window stickers visible on every new Subaru vehicle offered for sale at their authorized dealerships. Subaru controls the content of these "Monroney" stickers—its authorized dealerships have no input with respect to their content. Vehicle manufacturers like Subaru are legally required to affix a window sticker to every vehicle offered for sale in the United States pursuant to the Automobile Information Disclosure Act of 1958, 15 U.S.C. § 1231 *et seq.*, which, among other things, prohibits the removal or alteration of the sticker by anyone other than the ultimate purchaser prior to the sale of the car, including the dealership at which the vehicle is offered for sale.

## FACTUAL ALLEGATIONS

### A.    The Thermo Control Valve Defect

50.    Consumers depend on their vehicles to provide reliable and safe transportation.

51.    As background, the engines contained in the Class Vehicles use four reciprocating pistons to convert pressure into a rotating motion. Gasoline is mixed with air in the combustion chambers of the engine. To generate such rotating motion, a four-step sequence is used (the "Combustion Cycle"). First, the intake stroke begins with the inlet valve opening and a vaporized fuel mixture is pulled into the combustion chamber. Second, the compression stroke begins with the inlet valve closing and the piston beginning its movement upward, compressing the fuel mixture

in the combustion chamber. Third, the power stroke begins when the spark plug ignites the fuel mixture, expanding the gases and generating power that is transmitted to the crankshaft. And fourth, the exhaust stroke begins with the exhaust valve opening and the piston moving back up, forcing the exhaust gases out of the cylinder. The exhaust valve then closes, the inlet valve opens, and the Combustion Cycle repeats itself. A diagram of a Combustion Cycle is below:



52.　The Combustion Cycle creates heat, and engines typically run between 195 to 220 degrees Fahrenheit. In order to reduce the temperature and improve performance, the engine relies upon cooling systems to maintain engine operating temperatures.

53.　Because the primary purpose of an automotive cooling system is to dissipate heat and maintain engine temperatures during operation, it is imperative

that the parts that comprise the coolant system are robust enough to accurately sense engine temperatures.

54.    When the vehicle is used with the engine functioning, heat is generated by the Combustion Cycle and the engine coolant temperature increases until it reaches the optimal operating temperature. The thermo control valve ("TCV") (also known as temperature control valve or thermostatic control valve) is an integral component in maintaining optimal engine temperature and preventing the engine from overheating.

55.    The TCV works by sensing the temperature of the engine coolant; based this temperature, the TCV then allows a certain amount of coolant to pass through to the engine to cool down the engine and its components. The TCV must be able to sense engine temperatures in order to pass enough coolant through.

56.    The TCV is a multi-port electronically-operated fluid control valve that replaces the traditional thermostat design. The TCV is faster than traditional thermostats at responding to engine temperature changes, which should allow the engine to better maintain an optimal operating temperature, and help achieve better fuel economy.

57.    As shown below, the TCV is located underneath the intake manifold that is composed of a cylinder-shaped valve that connects to the engine by pipes:



58.     As the engine starts and begins to run, the engine will generate heat. As the heat builds in the engine, the TCV within the cooling system then begins to open. Once the TCV has opened, the water pump starts by taking coolant from the radiator and moving it through the engine block and associated components. As the coolant flows through the engine coolant passages, it absorbs heat from the engine, thereby allowing the engine to operate at its optimal temperature and avoid overheating. The coolant then returns back to the radiator, where it is cooled and then can be cycled through the Class Vehicle's engine again. A diagram depicting generally how a cooling system functions is included below as background.



59. The Thermo Control Valve in the Class Vehicles is manufactured from a plastic material. Other vehicle manufacturers utilize different materials for the thermostat and thermostat housing, such as aluminum. The revised TCV includes an enhanced stainless steel internal shaft and the use of an advanced resin molding process.

60. The Thermo Control Valves in the Class Vehicles see repeated heat cycling of engine coolant temperatures to approximately 220 degrees Fahrenheit. This regular and repeated heat cycling, combined with continuous vibrations and harmonics found in the Class Vehicles, requires the TCVs to be designed and manufactured so as to be able to withstand such an environment. Unfortunately, the

plastic and sub-par materials utilized by Defendants in the design and manufacturing of the TCVs contained in the Class Vehicles is entirely inadequate and prone to premature failure and cracking.

61.    When the TCV fails due to the Defect, it fails to sense the temperature of the engine and thus fails to allow an adequate amount of coolant to circulate through the engine, thereby failing to adequately dissipate the continuous heat from the engine.

62.    Consumers typically see the dashboard warning lights illuminate immediately after TCV failure, specifically the check engine light turns on and safety features are disabled, including Brake Assist, Eyesight Driver Assist Technology[2], Lane Keep Assist and Sway Warning, Pre-Collision Braking, Pre-Collision Throttle Management.

63.    A failed TCV causes a slew of additional problems if not replaced immediately, including coolant leaking, engine overheating, inconsistent temperatures in the engine, safety hazards, heat related damage to engine components, and catastrophic engine failure.

**B.    The Defect Poses a Safety Hazard**

64.    When the Defect manifests and the thermo control valve fails, engine coolant cannot flow through the engine as intended, the engine in the Class Vehicle

---

[2] https://www.subaru.com/eyesight.html (last visited November 24, 2023).

overheats, and the vehicle becomes inoperable. Because the engine cannot maintain a safe operating temperature, continued operation of the Class Vehicle can cause catastrophic engine damage. As a result, drivers become stranded and must seek roadside assistance or alternative means of transportation.

65.    Even just a few minutes of operation at high temperatures can cause catastrophic engine damage and accelerated wear of important engine components.

66.    Additionally, the Defect affects various safety features, including Brake Assist, Eyesight Driver Assist Technology[3], Lane Keep Assist and Sway Warning, Pre-Collision Braking, Pre-Collision Throttle Management. These features give drivers "an extra layer of safety and convenience".[4]

67.    When the Defect occurs, these features no longer function and drivers and those that share the road with them are exposed to an increased risk of collision.

**C.    Subaru's Deficient Warranty Performance**

68.    Subaru provides a three-year/36,000 mile New Vehicle Limited Warranty ("New Vehicle Limited Warranty") and a five-year/60,000 Powertrain Limited Warranty ("Powertrain Limited Warranty") for the Class Vehicles.[5] With

---

[3] https://www.subaru.com/eyesight.html (last visited November 24, 2023).
[4] Id.
[5] https://www.subaru.com/content/subaru/en/owners/vehicle-resources/warranties-2019.html; https://www.subaru.com/content/subaru/en/owners/vehicle-resources/warranties-2020.html;
https://www.subaru.com/content/subaru/en/owners/vehicle-resources/warranties-2021.html (last visited November 24, 2023).

limited exclusions, the New Vehicle Limited Warranty covers the entire vehicle—including the thermo control valve—as well as "any repairs needed to correct defects in material or workmanship reported during the applicable warranty period and which occur under normal use." The Powertrain Limited Warranty covers engine components, including the thermo control valve and surrounding parts such as intake and exhaust manifolds. The repairs are to be made without charge to the customer and within a "reasonable time."

69.     The Defect arises from defective materials and/or workmanship in the Class Vehicles' engine systems and is therefore covered under Subaru's warranties. The Defect tends to manifest at the expiration or shortly after the expiration of the warranty period. Yet Subaru has refused to fix the Defect. Instead, when owners and lessees take their Class Vehicles into Subaru dealerships for service, they are told that the necessary repairs and/or replacements of the thermo control valve are not covered under warranty and that they will be required to pay for the necessary repairs out of pocket or forego a working vehicle.

70.     The Defect impacts the core functionality of the Class Vehicles—when it manifests, the Defect prevents consumers from operating their vehicles and using them for reliable transportation. Subaru's refusal to repair the Defect shifts the costs of the Defect onto its customers, who must resort to paying for the necessary repairs to the thermo control valve in order to have a vehicle that will function properly and

consistently.

**D.    Subaru's Exclusive Knowledge of the Defect**

71.    Subaru had exclusive and superior knowledge of the Defect before Plaintiffs purchased their Class Vehicles through a variety of sources unavailable to consumers, including internal pre-release testing data, consumer complaints to Subaru and its dealers, Subaru's testing in response to the complaints and in connection with service bulletins, warranty data from its dealers, replacement parts sales data from its internal databases, and reimbursement claims paid to Subaru dealers for work performed in response to warranty claims.

72.    For decades, Subaru has used a Product Quality Management System for developing, manufacturing, and distributing its products. During the design and development and production stages, Subaru conducts extensive testing and quality inspection of all the critical components of a vehicle—including the engine and engine components—to uncover defects and variations in manufacture.

73.    The distribution and sales stage of Subaru's quality management system begins when the vehicles are shipped to dealers. Subaru then collects and analyzes sales data from its dealership network and Customer Center for possible defects. Subaru therefore has exclusive access to data on how its vehicles are performing or not performing after they are sold.

74.    Subaru's Quality Assurance Division works closely with authorized

service technicians to detect and examine potentially widespread vehicle problems and to assist dealerships in diagnosing vehicle issues. The division collects and analyzes data from dealership service centers, parts sales reports, warranty claim data, and technical reports from Subaru engineers who examine vehicles brought in for warranty repairs.

75.    Subaru's dealership service centers are required to provide Subaru with detailed documentation—e.g., the actual parts that were replaced—for repairs made pursuant to its warranties, and Subaru sometimes audits dealerships to verify that the work was completed. Subaru's National Warranty Department reviews warranty data submitted by its dealership service centers and authorized technicians in order to identify trends in warranty repairs and customer complaints, as well as potential vehicle defects.

76.    Subaru service centers and independent repair shops order replacement parts, including TCVs, directly from Subaru. Subaru monitors sales reports for these replacement parts and consequently has real-time information about the number, frequency, and trends of replacement part orders.

77.    Subaru's knowledge of the Defect in the Class Vehicles is demonstrated by a Technical Service Bulletin ("TSB") it issued to the public to address problems with the thermo control valves in its vehicles. TSBs are only issued when there have been a sufficient number of consumer complaints for a manufacturer to justify

devoting resources to investigate, diagnose, and attempt to remedy a reported problem in its vehicles (in addition to designing and manufacturing any replacement parts). It takes at least several months, if not more than a year, for a manufacturer to investigate, source, and issue a TSB.

78.    In February 2022, Subaru issued a TSB, Number 09-80-21 for "Thermo Control Valve – Design Change" to prevent "sensor corrosion."[6] Notably, Subaru began production of new TCVs on June 7, 2021.[7]

79.    The TSB announces a "new thermo control valve assembly" that contains "an enhanced stainless steel internal shaft for optimized durability along with advanced water proofing for the sensor portion." In addition, a new resin molding process was also used in the new assembly. A diagram of the changes that appears in the TSB is included below:



---

[6] Available at https://static.nhtsa.gov/odi/tsbs/2022/MC-10208664-0001.pdf (last visited November 24, 2023).
[7] See *id.*

80.    The TSB applies to 2020-21 MY Legacy and Outback, 2019-21 MY Forester, and 2021 MY Crosstrek vehicles.

81.    The TSB does not extend or modify Subaru's existing warranties, and coverage for the necessary repairs are only included for those still under Subaru's warranties.

82.    Given that TSBs are only issued after a significant number of complaints that are generally investigated over a period of months or years, Subaru was aware of the Defect and the thermo control valve issues in its vehicles well before May 2020.

83.    As Plaintiffs' experiences show, Subaru's bulletin and purported "fix" did not address the underlying cause of the defect in the thermo control valve and has repeatedly been proven ineffective. For example, an owner who experienced thermo control valve failure complained online that the dealer informed her there was "no guarantee" that the fix would be effective because "the new part … is the same part that is failing."[8]

84.    The internet also is replete with driver complaints on message boards, social media, and other websites concerning the Defect. For example, a Facebook group called the "2019+ Subaru Forester Owners" now has more than 10,000

---

[8] https://www.carcomplaints.com/Subaru/Forester/2019/cooling_system/thermo_control_valve_assembly.shtml (last visited November 24, 2023).

members.[9]

85.    Numerous complaints about the Defect appear on websites Subaru actively monitors, such as the website for the National Highway Traffic Safety Administration ("NHTSA") and Subaru's owner message boards. Many of the related complaints posted on social media websites such as Facebook and Twitter also tag Subaru in the posts. Although Subaru monitors these forums, it is difficult for consumers with limited resources to do so, and, unlike Subaru, consumers do not have access to the information necessary to verify the issues discussed in the complaints. The following are complaints submitted by Class Vehicle owners:[10]

**NHTSA ID Number: 11541053**
**Incident Date August 12, 2023**
**Consumer Location MILTON, WV**
**Vehicle Identification Number JF2GTHRC9MH\*\*\*\***
**Summary of Complaint**
The issue is the Engine Coolant Bypass Valve. This causes the Engine to not take in as much coolant resulting in the engine getting much hotter than it should, thus putting those in the car's safety at risk. This could ultimately lead to a fire and/or cause the car to suddenly lose power. My car already refuses to go above 3000 rpm's and is very laggy when driving. The car itself shows a code that the bypass valve needs replaced & the check engine has come on. However, Subaru has failed to acknowledge that this is an issue amongst most of their vehicles since 2020. This issue also disables the Subaru Eyesight which is in control of adaptive cruise control, pre collision breaking, and sway warning. With those features now disabled, the car has lost the Safety Package that Subaru boasts. I have read on many online forums that this has been an ongoing issue now for many customers, a bulk of which

---

[9]

https://www.facebook.com/groups/sksubaruforesterowners/?ref=share&mibextid=PPIc3T (last visited November 24, 2023).
[10] The following complaints are reproduced as they appear online. Any typographical errors are attributable to the original author.

experienced total engine failure. This lack of responsibly is putting many lives at risk on the road every day. I hope this helps shed light to this issue to Subaru & that this part is recalled so that Subaru must pay for the repairs instead of the car owners. Also, the repair part is around $500 & maintenance must be done by Subaru which is another $400-500 for labor. My opinion is they are using this defect as a way to make easy money on many customers since 2021. Here's a link to the Service Bulletin that has been created about this issue: https://static.nhtsa.gov/odi/tsbs/2022/MC-10208664-0001.pdf?fbclid=IwAR355WNLzftp3Qhmj7GnfmPFL9VODbDEbiT9X5Admr7n90YI4rTa4J5HSIk_aem_Aex4J.

**NHTSA ID Number: 11523515**
**Incident Date April 10, 2023**
**Consumer Location Unknown**
**Vehicle Identification Number JF2SKAWC7KH\*\*\*\***
**Summary of Complaint**
The contact owns a 2019 Subaru Forester. The contact stated while driving 20 MPH, the check engine warning light illuminated. The contact took the vehicle to the local dealer, where it was diagnosed with needing the temperature control valve (TCV) to be replaced. The vehicle was not repaired. The manufacturer had been informed of the failure. The failure mileage was approximately 67,000. The consumer had to get the vehicle repaired due to this TCV valve issue all the security systems were not functioning causing safety issues.

**NHTSA ID Number: 11519752**
**Incident Date April 28, 2023**
**Consumer Location Unknown**
**Vehicle Identification Number JF2SKASC8KH\*\*\*\***
**Summary of Complaint**
The contact owns a 2019 Subaru Forester. The contact stated that while driving at an undisclosed speed, the check engine warning light illuminated. The vehicle was taken to Auto Zone, where it was diagnosed that the thermal control valve was faulty. The vehicle was then taken to the dealer, where the thermal control valve was replaced. The manufacturer was made aware of the failure. The contact related the failure to Technical Service Bulletin: 09-80-21 (Thermal Control Valve – Design Change) however, the vehicle was not covered under the TSB. The failure mileage was approximately 93,000.

**NHTSA ID Number: 11513406**
**Incident Date March 18, 2023**

**Consumer Location Unknown**
**Vehicle Identification Number JF2SKAJC7LH\*\*\*\***
**Summary of Complaint**
The contact owns a 2020 Subaru Forester. The contact stated while driving 35-38 MPH in cold weather, the temperature gauge indicated that the vehicle temperature was cold. The check engine warning light was illuminated. Additionally, the Forward Collision Avoidance system, the Lane Keep Assist, the Auto START/STOP feature, the cruise control mode, and other unknown features no longer operable messages were displayed. Additionally, the vehicle shifted into Sport (S) mode. The contact was able to drive to her residence. The vehicle was taken to the dealer, where it was diagnosed that the thermal control valve needed to be replaced. The contact stated that there was an inch-long slice like cut in the front passenger's seat. The vehicle was not repaired. The manufacturer was notified of the failure via mail. The failure mileage was approximately 47,000.

**NHTSA ID Number: 11490232**
**Incident Date August 29, 2022**
**Consumer Location STURGIS, MI**
**Vehicle Identification Number JF2SKARCXLH\*\*\*\***
**Summary of Complaint**
The contact owns a 2020 Subaru Forester. The contact stated while driving approximately 30 MPH, the check engine warning light illuminated. The contact stated that the check engine warning light remained illuminated after starting the vehicle and shifting to drive(D) or reverse(R). The contact stated that the engine temperature gauge indicated that the engine was "COLD" even after she had driven the vehicle approximately 30 minutes. The contact stated that the heater no longer worked as intended and only blew out cold air. The contact had taken the vehicle to a local dealer where it was diagnosed and determined that the thermostat coolant valve needed to be replaced. The contact was advised that the part needed for the repair was on a national back order. The vehicle had not been repaired. The manufacturer had been informed of the failure. The failure mileage was approximately 65,000.

**NHTSA ID Number: 11532338**
**Incident Date July 6, 2023**
**Consumer Location Unknown**
**Vehicle Identification Number JF2SKAJC6LH\*\*\*\***
**Summary of Complaint**
The contact owns a 2020 Subaru Forester. The contact stated that while driving approximately 70 MPH, the accelerator pedal was depressed, and the vehicle started

to lose motive power. The check engine warning light was illuminated. The vehicle was steered to the side of the road where the vehicle then stalled. The vehicle was restarted approximately 15 minutes later. The vehicle was towed to a dealer where it was diagnosed that the thermal control valve and electric water pump needed to be replaced. The vehicle was repaired. The manufacturer was not notified of the failure. The failure mileage was approximately 13,000.

**NHTSA ID Number: 11444162**
**Incident Date December 15, 2021**
**Consumer Location BREMERTON, WA**
**Vehicle Identification Number Jf2skagc4kh\*\*\*\***
**Summary of Complaint**
Check engine light came on and code was for the TCV. The dealership said it would be $1500 to repair and was not under warranty…even though my car is a 2019 Subaru Forester with just 17,000 miles. The Subaru forums on Facebook show that numerous other people are also having this problem.

**NHTSA ID Number: 11466319**
**Incident Date May 25, 2022**
**Consumer Location Unknown**
**Vehicle Identification Number JF2SKAPC6KH\*\*\*\***
**Summary of Complaint**
My 2019 Subaru Forester Sport only had 41,000 and the thermal control valve on it failed. The engine is running really cold and sometimes without warning certain safety feature shutoff as a result. There were no warning signals before it failed but when it went out the check engine light came on as well as about 5 other warnings. I had it diagnosed at Young Subaru in Ogden, UT. After doing some research I found that this specific part recently underwent a design change due to this malfunctioning. I've found several other Subaru owners that are having the exact same issue where the safety features are completely disabled as a result of this poorly manufactured part. This part needs to be recalled asap before it can continue to cause more damage to the engines or the people who drive these vehicles.

**NHTSA ID Number: 11477880**
**Incident Date August 1, 2022**
**Consumer Location ELMORE, AL**
**Vehicle Identification Number Jf2skaec5kh\*\*\*\***
**Summary of Complaint**
Thermo electro valve failed, tripping check engine lights in the dashboard. I was told that the vehicle was undrivable until the part, which has been affected by supply

chain issues, can be acquired by the dealer.

**NHTSA ID Number: 11482772**
**Incident Date August 23, 2022**
**Consumer Location ROCKVILLE, MD**
**Vehicle Identification Number JF2SKAGC7KH\*\*\*\***
**Summary of Complaint**

The problem cited below is on a 2019 Subaru Forester with 20,101 miles. The 'check engine' light came on when I started my vehicle as well as all the ADAS warning lights came on. All ADAS were inoperable. The car was drivable so I cautiously drove it to a Subaru dealership. While driving, I noticed the engine never warmed up. Running a cold engine causes an emissions problem and may be a violation of an EPA standard. The problem was diagnosed by the dealership as a faulty Thermo Control Valve Assembly, Part Number (21319AA010). Upon researching the problem on www.SubaruForester.org, I discovered over 240 similar postings about the same complaint on the same model car. I consider this to be a Safey issue with a potential of significant engine damage causing engine failure as well as making all the ADAS inoperable. Subaru of America is aware of the extent of this problem and should be made liable for recalling these vehicles and fixing this safety problem. The vehicle is currently (since Aug. 23, 2022) at the dealership awaiting a back-ordered part. I am currently negotiating with Subaru to have the part repaired under the 5 year/60,000 mile powertrain warranty. Please look into this issue since so many other owners of this vehicle are having this same issue. Thank You.

**NHTSA ID Number: 11485552**
**Incident Date August 10, 2022**
**Consumer Location NOVATO, CA**
**Vehicle Identification Number JF2SKAUC3KH\*\*\*\***
**Summary of Complaint**

The problem seems to be a faulty Thermo Control Valve Assembly. When I started the car, the dashboard lit up with several warning signs including the check engine light and 6 or 7 other warning lights. I also received texts and emails from Subaru saying to have my vehicle serviced ASAP. My 2019 Forester only has about 16,000 miles on the odometer. Continuing to drive would cause damage to the engine and potentially the car could abruptly stop on its own. Our car has been in the service department of our dealership for five weeks. I just received a call this morning that we had to return the loaner rental today, but that the thermal control valve is not expected until mid- or late-October. (It is now September 20.) I researched several Subaru blogs, and it seems that many others are having the same issue with their Foresters. Our dealership has five automobiles in their service department waiting

for this part (and this is only one dealership). I also researched the Subaru service bulletins and see that they have a newly-designed thermo control valve assembly (same part number as the old one but a different date etched into the part). Apparently this has been an issue known by Subaru since at least September 2021 when their service bulletin came out. It seems that with so many owners having the same issues, there should be a recall and part replacement without cost to the owners.

**NHTSA ID Number: 11486657**
**Incident Date September 23, 2022**
**Consumer Location FLUSHING, NY**
**Vehicle Identification Number JF2SKAWC9KH\*\*\*\***
**Summary of Complaint**
Keep getting check engine light. Blue cold engine light stays on. Getting code P26A5 Engine Coolant Bypass Valve 'A' Position Sensor Circuit Range. Parts are unavailable at the dealer. They can't give me a time frame when they become available.

**NHTSA ID Number: 11488786**
**Incident Date October 7, 2022**
**Consumer Location Unknown**
**Vehicle Identification Number JF2SKAUC1KH\*\*\*\***
**Summary of Complaint**
On 10/7/2022, all the warning lights came on and stayed on, even after tightening the fuel cap and replacing the battery. I brought the car to Ocala Subaru this morning, and paid for a diagnostic that shows the Thermal Control Valve needs replacement. Apparently this is now a common problem on this year and model Subaru. I was told that this is not covered under the powertrain warranty, even though it is part of the engine assembly, and is a very expensive repair, even though the car has only 43,669 miles on it. I was told the part is on national back order and that the car is okay to drive, but that most of the safety systems that have the lit warning lights are now disabled. This is the car my wife uses to transport our 6-year-old granddaughter to school and swim practice and events, as well as elsewhere, and I feel this has compromised their safety and warrants a recall.

**NHTSA ID Number: 11491974**
**Incident Date November 1, 2022**
**Consumer Location BIRMINGHAM, AL**
**Vehicle Identification Number JF2SKAPC9KH\*\*\*\***
**Summary of Complaint**

TCV valve failed and as a result RAB and Eyesight were disabled. The TCV has a known defective design and there is a bulletin about it. MC-10208664-0001 https://static.nhtsa.gov/odi/tsbs/2022/MC-10208664-0001.pdf.

**NHTSA ID Number: 11493932**
**Incident Date November 10, 2022**
**Consumer Location EAST CANTON, OH**
**Vehicle Identification Number JF2SKAEC6KH****
**Summary of Complaint**
The Thermo Control Valve has failed and threw a check engine light. This disables the Eye Sight System and causes no heat or defrosters. There seems to be a huge backorder with no ETA in sight for the replacement part. When this part fails there is no defrosters, no crash warning, no emergency braking....

**NHTSA ID Number: 11497782**
**Incident Date December 10, 2022**
**Consumer Location HILLSBOROUGH, NC**
**Vehicle Identification Number JF2SKACC9KH****
**Summary of Complaint**
The Thermo Control Valve has stopped working It causes the engine to overheat while drive. The windows fog up in the cold making it hard to because the defrost does not work Yes by an independent service center No No the engine light came while I was drive.

**NHTSA ID Number: 11498516**
**Incident Date December 19, 2022**
**Consumer Location Unknown**
**Vehicle Identification Number JF2SKACC4KH****
**Summary of Complaint**
The Subaru Forester 2019 Thermo Control Valve (TCV) fails. It is responsible for cabin temperature but also engine temperature and can result in overheating. There are numerous reports that this is a frequent problem and dealerships want to charge $1200+ to replace. It is certainly a design flaw and should be issued for recall. Mine is available for inspection and has been inspected by the dealership. It was first detected by a check engine light.

**NHTSA ID Number: 11506336**
**Incident Date February 7, 2023**
**Consumer Location HUNTINGTON BEACH, CA**
**Vehicle Identification Number JF2SKAAC0KH****

**Summary of Complaint**

Thermo Control Valve went bad only after 4 years of owning a car. I do mostly highway driving put very little stress on the car. I think thermo Control Valve going bad just within 4 year. I suspect the parts to be faulty and it has some design flaw.

**NHTSA ID Number: 11516121**
**Incident Date March 30, 2023**
**Consumer Location Unknown**
**Vehicle Identification Number JF2SKAPC0KH****
**Summary of Complaint**

Check engine light seemed to put vehicle in "limp" mode, cancelling all onboard safety features, i.e. "eyesight", cruise control, vehicle dynamics control, blinking "S" Upon bringing it to a repair shop, they informed me that the thermal value control needs to be replaced, despite having owned the car for only three years. This leads me to suspect either a faulty part or a design flaw.

**NHTSA ID Number: 11518902**
**Incident Date April 17, 2023**
**Consumer Location Unknown**
**Vehicle Identification Number JF2SKAUC8KH****
**Summary of Complaint**

* Eyesight disabled and Thermal Control Valve-P26A3 diagnostic code. Vehicle is available upon request. * Eyesight immediately disabled and maintaining that all safety features are disabled. Safety features that are relied upon, disengaged, and aborted for literally a Subaru known engine issue (TSB #09-80-21) - THAT IS SAFETY AT RISK to everyone that owns a Subaru with this issue. * 2 Independent services confirmed diagnostic- P26A3 *Subaru was requested to review when the vehicle was in for recall inspection. * No warning lamps, messages or any other symptoms of the problem prior to the failure. The warning lights and safety features disengaged all appeared at one time.

**NHTSA ID Number: 11519164**
**Incident Date April 25, 2023**
**Consumer Location Unknown**
**Vehicle Identification Number JF2SKAPC8KH****
**Summary of Complaint**

THERMO CONTROL VALVE (TCV) is suspected. I am a member of 2019 Forester group on facebook and reports are quit common for these model year. The check engine light is on and RAB system/eyesight is disabled.

**NHTSA ID Number: 11523826**
**Incident Date May 16, 2023**
**Consumer Location Unknown**
**Vehicle Identification Number JF2SKAUC2KH\*\*\*\***
**Summary of Complaint**
I was driving my 2019 Subaru Forester on 5/16 and it was operating normally that morning with no visible warning lights. I got back into the car later and it started fine. While getting onto a local highway, accelerating to highway speeds, multiple warning lights including the check engine light turned on. I was subsequently unable to accelerate and needed to coast to a stop on the closest off ramp, fortunately avoiding an accident. After turning the vehicle off and back on again the check engine light was still illuminated and the car would only make short lurching movements. I needed to have the car towed to a local Subaru dealership (Maita Subaru in Sacramento, CA) and they diagnosed it as a problem with the engine's thermo control valve. This was replaced under warranty and the vehicle is now working normally. The dealership told me this is a known issue with 2019 Foresters and that they've repaired other vehicles under similar circumstances. Multiple other owners have detailed similar experiences on an online forum as well. There does not appear to be a recall but this is a serious safety issue.

**NHTSA ID Number: 11527708**
**Incident Date May 14, 2023**
**Consumer Location Unknown**
**Vehicle Identification Number JF2SKAGC0KH\*\*\*\***
**Summary of Complaint**
According to an inspection from the Subaru dealership, my thermo control valve failed. Because of this, the check engine light came on and my safety "eyesight" feature (automatic breaking/collision prevention system) was disabled. This first occurred after starting my car after a visit to a park 2 miles away. When this occurred, I drove my car home and parked it until I could get it in to be inspected at the Subaru dealership who pinpointed the problem. Besides a quick check from AutoZone, this is the only representative that has inspective my vehicle.

**NHTSA ID Number: 11529493**
**Incident Date June 19, 2023**
**Consumer Location Unknown**
**Vehicle Identification Number JF2SKAKC9KH\*\*\*\***
**Summary of Complaint**
RAB disabled, eye sight disabled, I drive disabled, check engine light came on. Car drives like it's is in sport mode with very touchy throttle. Pulled a code and it's the

TCV. It's a known issue by Subaru with a part that has since been revamped but with thousands of vehicles on the road affected. Should be a recall. Contacted Subaru of America with no response so now a $1,900-$2,500 depending on dealer cost is being pushed on the consumer. Vehicle currently has 80,000 miles but as a Subaru ambassador I used to put a lot of miles on going to events, meets and typical camping and outdoors activities you expect out of these vehicles so my milage is slightly higher than the normal work commuter.

**NHTSA ID Number: 11530470**
**Incident Date June 25, 2023**
**Consumer Location Unknown**
**Vehicle Identification Number JF2SKAEC7KH\*\*\*\***
**Summary of Complaint**
When I turn the car on it flashes check engine eyesite failure which then turns off the ability to use cruise control, crash detection, lane assist, ext. we called Dick Hannah Subaru and the code came up as P26A5 engine coolant bypass valve A position sensor. They said a thermo valve needs replaced and they've seen that happen a lot in 2019/2020 Subarus.

**NHTSA ID Number: 11531333**
**Incident Date May 23, 2023**
**Consumer Location Unknown**
**Vehicle Identification Number JF2SKAJC8KH\*\*\*\***
**Summary of Complaint**
The TCV Thermostat Control Valve has failed which is a known issue and Subaru is very aware. The vehicle will ultimately believe it is overheating and shut itself down. This is a very well known incident and should be a proactive recall but instead subaru insists on waiting for customers to fail and hope its outside of warranty so they can charge them $2k to replace a known faulty design and part.

**NHTSA ID Number: 11531679**
**Incident Date July 5, 2023**
**Consumer Location SOMERS, NY**
**Vehicle Identification Number JF2SKAWC7KH\*\*\*\***
**Summary of Complaint**
Dear National Highway Traffic Safety Administration, I am writing to report a safety issue with my 2019 Subaru Forester, which I believe may affect many other Subaru vehicles as well. Specifically, I have experienced a problem with the thermo control valve, which has caused the EyeSight safety features to be disabled and potentially poses a safety risk. I first became aware of this issue when the EyeSight safety

features on my vehicle were automatically disabled due to a malfunction. I brought my vehicle to a Subaru dealership for an inspection, and they determined that the thermo control valve was faulty and needed to be replaced. It was alarming to learn that many other Subaru owners had experienced the same issue, and some had even experienced engine failure as a result. The EyeSight system is a driver assistance technology developed by Subaru that uses cameras and sensors to monitor the road and surrounding environment, alerting drivers to potential hazards and providing automatic braking support if necessary. This technology has been recognized as one of the most advanced driver assistance technologies available, and is designed to help prevent accidents and reduce the severity of collisions. The EyeSight system includes features such as adaptive cruise control, pre-collision braking, lane departure warning, and sway warning, which work together to provide a comprehensive safety package for drivers and passengers. These features are critical in keeping drivers safe. I am concerned that this issue may be more widespread than initially thought, and that it may pose a safety risk to drivers and passengers of affected Subaru vehicles. The faulty thermo control valve can cause the EyeSight safety features to be disabled, which can lead to reduced safety performance, accidents, and potentially harm to drivers and passengers. Sincerely, Davide Alves.

**NHTSA ID Number: 11532995**
**Incident Date August 5, 2022**
**Consumer Location DILLSBURG, PA**
**Vehicle Identification Number JF2SKAUC2KH****
**Summary of Complaint**
My thermo control valve went out while I was on the highway. My car lost power and all safety features. It's been replaced but should be a recall.

**NHTSA ID Number: 11543395**
**Incident Date September 7, 2023**
**Consumer Location PELION, SC**
**Vehicle Identification Number 1J25KACC8KH****
**Summary of Complaint**
Thermo Control Valve malfuncitoned, causing check engine light to come on. Car only has 72k miles on it, so dealership (McDaniels Subaru, Columbia. SC) said they couldn't repair under warranty. Even though car has 100K powertrain. To get to this part you have to remove intake manifold, so I don't see how it's not considered part of the powertrain. While Check Engine light is on, NONE of the safety features of this car function. From Internet research, this part is going to fail, (part has been redesigned due to this), it's just a matter of whether it fails within your warranty period or not. Mine was not.

**NHTSA ID Number: 11545203**
**Incident Date September 15, 2023**
**Consumer Location GAINESVILLE, FL**
**Vehicle Identification Number JF2SKAGC9KH****
**Summary of Complaint**
Thermo control valve needs replacing at 34k miles. Not covered under warranty.
Also needed new tires at 30k miles and now faulty ignition coil.

**NHTSA ID Number: 11545701**
**Incident Date June 1, 2023**
**Consumer Location GEORGETOWN, TX**
**Vehicle Identification Number JF2SKAJC8KH****
**Summary of Complaint**
2019 subaru forester failed thermo control valve. There are literally 1000s of
complaints on this issue and SOA refuses to issue a recall. Subaru has issued a
bulletin to replace the faulty design with redesigned part. When this fails the car goes
into limp mode and all lights come on. Very dangerous and quote frankly completely
irresponsible that subaru refuses to recall this failure. I am out of warranty and it's
minimum 2k to fix. I have a 2019 vehicle parked that I can't get Inspected and can't
afford to fix because Subaru of America is trying to save money. Just a matter of
time before this causes a tragic accident before they own up to recall.

**NHTSA ID Number: 11546663**
**Incident Date September 26, 2023**
**Consumer Location WESTBOROUGH, MA**
**Vehicle Identification Number JF2SKACC0KH****
**Summary of Complaint**
1 . TERMAL CONTROL VALVE 2. TRAVELING OUT OF STATE AND
ENGINE LIGHT CAME ON 3. WARNING LIGHT (CHECK ENGINE WAS ON)
4 CONFIRMNED BY DEALER 5. ALL LIGHTS ON DASH BOARDS ON.

**NHTSA ID Number: 11548626**
**Incident Date October 2, 2023**
**Consumer Location FAIRFAX, VA**
**Vehicle Identification Number JF2SKAEC6KH****
**Summary of Complaint**
4 days ago my Check Engine light came on. In my car, when this happens, it disables
all Eyesight features - collision warning, lane departure warning, etc. Work hours
being what they are, I drove home that night and back to work the next day with it

on. I managed to get it scanned when it popped a code for the Coolant Bypass Valve. Searching that code online lead me to DOZENS AND DOZENS of forums, posts, stories of the same code popping up on other 2019-2020 Subaru's. They all had to take it in for a hefty repair. It also led me to a Service Bulletin issued last year, which showed that Subaru had rebuilt the TCV so it could withstand corrosion, unlike the previous version. So naturally I took it into my local dealership to have it looked at, and sure enough - the TCV needed to be replaced. WHY HASN"T THIS PART BEEN RECALLED YET??? Given there is no thermostat on my cars dash, I would have no clue whether my car was overheating due to this faulty valve, until its too late. It seems like this is a big potential safety issue that Subaru needs to address, and someone needs to force their hand.

**NHTSA ID Number: 11551424**
**Incident Date October 2, 2023**
**Consumer Location NAPERVILLE, IL**
**Vehicle Identification Number JF2SKAPC2KH****
**Summary of Complaint**
The temperature control valve (TCV) has gone bad and so the check engine light is on and reverse automatic braking and the Eyesight system is disabled. The problem with the temperature control valve is unrelated to the safety systems, however, when this valve goes bad, these safety systems are disabled automatically.

**NHTSA ID Number: 11553451**
**Incident Date September 29, 2023**
**Consumer Location SYRACUSE, NY**
**Vehicle Identification Number JF2SKAGC5KH****
**Summary of Complaint**
The check engine light came on and all of the eyesight components on the car were disabled as I was traveling down the highway at 70 mph (this included the adaptive cruise control, the lane departure warning, forward collision warning, etc). In addition, the engine thermostat light came on and the heater and defroster stopped working. It was cold and rainy and the window started to fog up and I was unable to clear it without a functioning defroster. This was definitely a safety issue and I had to stop driving. The car was taken to a subaru dealer today and diagnosed with faulty thermo control valve. The technician told me the car should NOT be driven in this condition due to the problem being in the engine coolant system. This is a known issue on the 2019 Forester, and other Subaru models as well, and has a TSB originally issued in Sept 2021. (#09-80-21) My car has 70K miles and therefore is just out of the warranty period. I will have to pay over $1500 to replace this part and because it is a safety issue I have no choice but to pay for the repair. It is a part that

is known to be defective and I am requesting that a recall should be issued before others are also put in potential danger and/or forced to pay large sums of money to get it fixed.

**NHTSA ID Number: 11490977**
**Incident Date September 15, 2022**
**Consumer Location FORT LEE, NJ**
**Vehicle Identification Number JF2SKAXC6LH\*\*\*\***
**Summary of Complaint**
This is about a problem of which your agency is already aware. Subaru of America has been aware of a defective Thermo Control Valve for almost a year (Part 21319AA010). The part was redesigned since the initial part was subject to extreme corrosion. The redesigned part has the same part number as the original part. Subaru did not do any recall but instead waited for the parts to fail. When it fails on a car with safety features (called "eyesight"), each and every safety feature is permanently disabled until the redesigned part is installed. In addition, the engine runs too cool and there is little or no cabin heat. My car has been on the lot of my local dealership for 2 months with no end in sight. My car is covered by the original warranty and an extended warranty. Managers at the dealership have told me that they have no idea when the part will arrive, that it may be many months and that there are many people already waiting for the part. A 6-page letter by me to the General Counsel of Subaru of America did not result in any direct response. By information and belief, this involves thousands of cars nationwide. By information and belief, dealerships are initially telling people the cars are still drivable despite the loss of all safety features since this what was initially told to me. I refused to accept the car in a defective unsafe condition. There may be thousands of cars being driven in which said safety features are fully disabled. Subaru claims the part has been on "back order" since March. By information and belief, based upon Subaru's own February 2022 service bulletin, it appears that the newly designed part is currently being installed on new cars at the factory thereby putting into question the "backorder" label. This analysis was enunciated in detail in my letter to Subaru of America's General Counsel and there was no response contesting that allegation. Your agency's investigation and intervention are immediately required.

**NHTSA ID Number: 11511658**
**Incident Date March 5, 2023**
**Consumer Location Unknown**
**Vehicle Identification Number JF2SKADC0LH\*\*\*\***
**Summary of Complaint**

I was on the highway doing 70 mph with the adaptive cruise control set. Then suddenly the check engine light turned on, the eye site and cruise shut down and the car slowed down quickly to 60 mph almost getting rear ended. This Subaru Forester has 65,592 miles. The Subaru Dealer said that the cooling therm valve is bad and needs to be replaced. This cooling therm valve seems to be a major part of the engine and they want $1500 to fix the problem.

**NHTSA ID Number: 11514209**
**Incident Date February 5, 2023**
**Consumer Location HESPERIA, CA**
**Vehicle Identification Number JF2SKAMCXLH****
**Summary of Complaint**
The check engine light illuminated and the thermo control valve failed at 3 years old. The defrost and heater stopped working immediately making visibility extremely difficult . The eyesight and automatic braking system were also disabled due to the TCV issue. My Forester mpg dropped to under 20 mpg. The Subaru dealer inspected and confirmed code P26A3 and stated the thermo control valve needs to be replaced.

**NHTSA ID Number: 11517612**
**Incident Date April 13, 2023**
**Consumer Location Unknown**
**Vehicle Identification Number JF2SKAMC4LH****
**Summary of Complaint**
While driving the vehicle suddenly stalled and stopped running. The dashboard illuminated with most lights and the check engine message came on the screen. I was thankfully able to get into the shoulder on the road safely without creating an accident or getting injured. The vehicle would not start again and had to be towed to the dealership. I am now out $1800 because I am slightly over my powertrain warranty in mileage on the vehicle. This is a known issue in bulletin: https://static.nhtsa.gov/odi/tsbs/2022/MC-10208664-0001.pdf I am not only disappointed with Subaru of America and NHTSA that this is not already a recall but I am also willing to seek legal action and compensation if this repair is not going to be covered. There are many incidents and reports online of similar issues: https://www.subaruforester.org/threads/2019-thermo-control-valve-assembly-and-warranty-merged-thread.823510/ https://www.carcomplaints.com/Subaru/Forester/2020/drivetrain/power_train.shtm l I have filed a case with Subaru of America corporate and am waiting to hear back. Someone is going to cause an accident or end up dead because of this faulty part. It is borderline criminal that this is not already a recall.

**NHTSA ID Number: 11524993**
**Incident Date May 22, 2023**
**Consumer Location Unknown**
**Vehicle Identification Number JF2SKADC9LH\*\*\*\***
**Summary of Complaint**
The thermo control valve on my 2020 Subaru Forester is broken and needs to be replaced. I have owned the car for 2 years, am the first owner, and it has less than 19,000 miles. 90 minutes into a drive the "coolant temp low" indicator light came on. After I pulled over, turned off the engine, and turned it back on the check engine light and sport mode indicator light came on, and all ADAS were disabled. The coolant level was low so I refilled it and took it to the manufacturer the next morning. They inspected my car and confirmed it the thermo control valve was broken. It is still broken as I cannot afford the repair and it is available for inspection upon request. My safety was put at risk by not having access to the ADAS forward collision warning, emergency breaking, and lane departure.

**NHTSA ID Number: 11526028**
**Incident Date May 31, 2023**
**Consumer Location Unknown**
**Vehicle Identification Number JF2SKAXC8LH\*\*\*\***
**Summary of Complaint**
Thermo control valve needed replaced. Check engine light and all safety lights turned on. All safety features were disabled when light came on. Subaru has has a recall on 2019 but not 2020 .

**NHTSA ID Number: 11532338**
**Incident Date July 6, 2023**
**Consumer Location Unknown**
**Vehicle Identification Number JF2SKAJC6LH\*\*\*\***
**Summary of Complaint**
The contact owns a 2020 Subaru Forester. The contact stated that while driving approximately 70 MPH, the accelerator pedal was depressed, and the vehicle started to lose motive power. The check engine warning light was illuminated. The vehicle was steered to the side of the road where the vehicle then stalled. The vehicle was restarted approximately 15 minutes later. The vehicle was towed to a dealer where it was diagnosed that the thermal control valve and electric water pump needed to be replaced. The vehicle was repaired. The manufacturer was not notified of the failure. The failure mileage was approximately 13,000.

**NHTSA ID Number: 11533817**
**Incident Date July 2, 2023**
**Consumer Location GLENVILLE, NY**
**Vehicle Identification Number JF2SKAGCXLH****
**Summary of Complaint**
While driving on the highway, the engine suddenly stopped and several warning lights appeared on dash. Driver was able to coast to shoulder but could have been a bad accident. It happened again on the way to dealer service center. Dealer reproduced the problem and identified it as a faulty thermo control valve. Dealer fixed it under warranty. Review of web reports makes this seem like a common problem with various Subaru automobiles.

**NHTSA ID Number: 11545341**
**Incident Date September 16, 2023**
**Consumer Location VALDOSTA, GA**
**Vehicle Identification Number JF2SKARCXLH****
**Summary of Complaint**
The thermo control valve malfunctioned causing the check engine light to come on which shut down all the safety features in the vehicle including the front eye sight camera, blind spot warning, the rear automatic braking, lane departure warning, adaptive cruise control, and lane keeping assistance. The check engine computer readout diagnostic trouble code was P26A5 "Engine Coolant Bypass Valve "A" Position Sensor Circuit Range/Performance". The vehicle was taken to a Subaru dealer who found the thermo valve performance was out of spec. This vehicle has not been recalled although the manufacturer replaced the part in 2021 vehicles acknowledging the valve was faulty. Because of the mileage on my vehicle, it was not covered under the warranty although many have been replaced under the manufacturer's warranty due to the failure of this valve under the 60,000 mile warranty. I believe this should be a recall item for others who experience this issue.

**NHTSA ID Number: 11548980**
**Incident Date September 15, 2023**
**Consumer Location DRAYTON, SC**
**Vehicle Identification Number JF2SKARC2LH****
**Summary of Complaint**
Daughter was driving vehicle on the morning of September 15, 2023, when smoke came from under hood. Immediately pulled over and engine was engulfed in flames. Got out of vehicle and moved a safe distance away as glass started to break and fire department arrived on scene. Picked up vehicle on September 12, 2023, after having the thermal control valve replaced (warranty) but after doing research there are other

components that also had to be replaced (fuel line, etc) as part of this repair. Noticed there have been other vehicles with recall due to thermal control valve just nothing on the Subaru Forester. Completely traumatized as the vehicle was gone in a little over 3 minutes. Have been in contact with Subaru but no resolution on what they believe caused the car to catch on fire. Did authorize them to get "black box" on September 29, 2023.

**NHTSA ID Number: 11554132**
**Incident Date November 5, 2023**
**Consumer Location Unknown**
**Vehicle Identification Number JF2SKAUC0LH\*\*\*\***
**Summary of Complaint**
The thermo control valve malfunctioned causing the check engine light to come on which shut down all the safety features in the vehicle including the front eye sight camera, blind spot warning, the rear automatic braking, lane departure warning, adaptive cruise control, and lane keeping assistance.

**NHTSA ID Number: 11555449**
**Incident Date November 13, 2023**
**Consumer Location GROVE CITY, OH**
**Vehicle Identification Number JF2SKAUC2LH\*\*\*\***
**Summary of Complaint**
While driving, most of the dash errors lights lit up- alerting me that the Eyesight Warning, RAB ( Reverse Auto Braking) and other safety functions were disabled. The Check Engine light was on and a flashing S next to it. Cold Engine light was illuminated as well. Dealer diagnosed with a faulty Thermal Control Valve, which somehow disabled all safety features. This is a common failure of Subarus and a recall is needed.

**NHTSA ID Number: 11555731**
**Incident Date November 2, 2023**
**Consumer Location NORCO, CA**
**Vehicle Identification Number JF2SKASC6LH\*\*\*\***
**Summary of Complaint**
41k miles P26A3 P26A5 \*\*\*\*Eyesight disabled\*\*\* \*\*\*Forward collision disabled \*\*\* Failed TCV and dealer will not cover because warranty period is over.

**NHTSA ID Number: 11509131**
**Incident Date February 21, 2023**
**Consumer Location Unknown**

**Vehicle Identification Number 4S3BWAC6XL3\*\*\*\***
**Summary of Complaint**
Check engine light came on at 55,500 miles on exactly the third anniversary of purchase. Local mechanic determined the code related to Thermo Control Valve failure. Apparently an ongoing issue with many Subarus since replacing the thermostat with this in their cars. Lost all eyesight features, including cruise control and high beams, as well as cabin heat in the midst of winter in the northeast. A simple google search reveals MANY instances of this subpar part falling on Subaru cars. $1,066 later, I feel a recall or coverage under powertrain warranty is warranted.

**NHTSA ID Number: 11544993**
**Incident Date September 13, 2023**
**Consumer Location Unknown**
**Vehicle Identification Number 4S3BWAN68L3\*\*\*\***
**Summary of Complaint**
Thermo Control Valve has malfunctioned. It disables all driver assistance, like lane assist, blind spot, RAB, collision braking, etc. I have seen on many forums that this is a known issue, across multiple vehicles from Subaru from 2019 to about 2021. The was a TSB put out about a new and improved part to fix this known issue.

**NHTSA ID Number: 11504684**
**Incident Date January 31, 2023**
**Consumer Location RANDLEMAN, NC**
**Vehicle Identification Number 4S4BTAEC7L3\*\*\*\***
**Summary of Complaint**
Check engine light came on with error code p26a5 which seems to be known issue with the Thermo Control Valve.

**NHTSA ID Number: 11507046**
**Incident Date February 8, 2023**
**Consumer Location TEMESCAL VALLEY, CA**
**Vehicle Identification Number 4S4BTANC4M3\*\*\*\***
**Summary of Complaint**
Traveling toll road /fwy at approx 70mph at rush hour and lost all power with Check engine light , emergency brake, lurching engine, all flashing at the same time!!! Coasted through 4 fwy lanes to offramp and service station- extreme danger!!! How was there no pile up with me going from 70-10 to coasting on a busy 15 Northbound fwy at 7:30 am?????? Was in toll lane and crossed toll 3 foot sticks to exit at first available exit. 2 cars followed me off as they were concerned for my safety Towed to shop where they put in new thermo valve, gasket intake manifold, Pipe ay- fuel

and gasket egr pipe 56000miles, 2 year old car 3 replaced windshields in last 6 months They said they've done 10 cars with this problem in the last year???? Insurance covered windshields , service center at Subaru inspected car.

**NHTSA ID Number: 11509066**
**Incident Date February 18, 2023**
**Consumer Location Unknown**
**Vehicle Identification Number 4S4BTANC3L3\*\*\*\***
**Summary of Complaint**
When we started vehicle, a wide array of systems shut down including cruise, Eye Sight, lane detection, auto high bean, adaptive light cornering - essentially anything "automated" or assisted - along with the heating. The car ran at a higher RPM at idle - 2000 vs a usual 700-800 - and rough shifted at speed. Again, as if the automatic transmission lost its sync. The water temp gauge was also off. Have since learned this was the "thermo control valve" and somewhat of a known fault on Outbacks of this year. We were lucky to reach home from the long trip we were on and to the dealership. At the dealership, the service team did not admit this was wide spread. Nor did they tell us there is an updated part from Subaru available. They intend to install the OEM part, which concerns us that in another 40-50k we will face the same $2k problem. We are unlucky that we just went over 60k miles, so this will not be covered under Subaru's 60k drivetrain warranty. That Subaru is covering a cooling system problem under the guise of being drive train tells me they know they have something to keep quiet.

**NHTSA ID Number: 11525241**
**Incident Date June 1, 2023**
**Consumer Location CHITTENANGO, NY**
**Vehicle Identification Number 4S4BTACC0L3\*\*\*\***
**Summary of Complaint**
While driving on the NYS Thruway (I90), I started to pass a Tractor Trailer, I put my blinker on and began moving to the right to pass. There were 2/3 cars in back of me also passing. I was using cruise control and I began to put my foot on the accelerator to finish my passing and move over to the right hand lane to let the other vehicles pass me. However, upon accelerating, my car started to drop power, multiple lights displaying simultaneously indicating a potential problem. (Eyesight Assist, Vehicle Dynamic Control, Brake & Engine Lights), the vehicle started jerking back and forth and I lost all but maybe 5 miles of power. My choice at that time was put my blinker on and try and move to the right - letting the Tractor Trailer pass me on the right and HOPE there was not another vehicle behind so I could move over safely at that crawling speed or go to the left into the gully. This could have

been a multiple car collision and maybe fatalities due to the speed and loss of control of my vehicle. After towing to the nearest dealer, they determined it was the Thermo Control Valve. I see now that there is a "service bulletin" and design change of this component and that other Subaru drivers have been affected the same way. This is a very serious situation. I ask, why no recall from Subaru. I have been without my vehicle now for 4 days and may not have it back until next week. I am very fearful of driving that vehicle again.

**NHTSA ID Number: 11539269**
**Incident Date August 7, 2023**
**Consumer Location MCKINLEYVILLE, CA**
**Vehicle Identification Number 4S4BTACC2L3\*\*\*\***
**Summary of Complaint**
While we were at a speed of about 55 mph on a state highway, I had just selected cruise control when all the lights went on in the dash--including the warning lights for the brake, the check engine light--and power shut down in the vehicle as if we'd run out of gas. We were able to keep a very slow speed of about 20-25mph, but had to activate the 4-way flashers to alert other drivers that we were losing speed. We managed to get over to the shoulder and call for a tow. We feel this was a catastrophic failure of the vehicle, which endangered both of us. At least we still had power steering. At the dealer, the techs advised us that the issue was likely due to a failure of the electronic thermostat control. The car was in the shop for a week, and was repaired at no cost to us. The thermo control valve and all related parts were replaced. If not under warranty, this would have cost over $2K. We had no warning that this component was failing.

**NHTSA ID Number: 11549421**
**Incident Date September 29, 2023**
**Consumer Location SUFFOLK, VA**
**Vehicle Identification Number 4S4BTAEC0L3\*\*\*\***
**Summary of Complaint**
The factory 2020 Subaru Outback Wagon is built with a Thermo Control Valve that is, essentially, made out of a composite plastic. As this part is part of the engine cooling system, it is placed under both heat and pressure. While it controls the anti-freeze to the heater core in the passenger compartment, it is also attached under cover to metal fittings. While the car now has about 90,000 miles, this control valve cracked and began to leak anti-freeze on top of the engine. Without cooling, the engine would likely be ruined. Thus, the car required immediate service. When a fault like this occurs, by the way, the Subaru Eyesight System shuts down taking with it various safety features. I had the defective part replaced and it's replacement is not made of composite plastic but, rather and more appropriately, metal. It is my

belief that the selection of the orignal part was a design defect ignoring the potential for differential expansion of the parts when exposed to such temperatures. Failure was inevitable. It is worth noting this is not an inexpensive repair as numerous parts have to be removed to access this valve. Likewise, the service representative made note that numerous other customers have had to have the same service.

**NHTSA ID Number: 11543033**
**Incident Date August 30, 2023**
**Consumer Location Unknown**
**Vehicle Identification Number 4S4BTAPC4M3\*\*\*\***
**Summary of Complaint**
I was driving and suddenly 13 flashing lights and codes from check engine to loss of cruise control and RAB -dealer says it needs a new thermo control valve (thermostat). This failed part has been common on Subarus for 3 years-reported on internet and even to the point where a guy sitting next to me today with same car and year and same $1800 bill and diagnosis. Should be a recall. Part was redesigned in 2022 I read.

**NHTSA ID Number: 11556403**
**Incident Date November 22, 2023**
**Consumer Location SPRING CREEK, NV**
**Vehicle Identification Number 4S4BTANC7M3\*\*\*\***
**Summary of Complaint**
Received error code P2682, a faulty Thermo Control Valve. This happened on 11/17/2023. Car potentially could have quit running in traffic. Subaru has identified the issue with TSB 09-80-21R. They have changed the design of the valve due to the many failures. My car has 74,000 miles. My brother in law has the same vehicle with 57,000, and his car is in the shop today for the same issue. The service tech working on his vehicle stated that he does a couple of these repairs a week, and that Subaru knows this part will fail and should issue a recall.

86.    In addition to being on notice of the Defect through NHTSA and other complaints, Subaru also directly learned of the Defect from its network of dealerships. Many of the customers who wrote online or to Subaru about their negative experiences with the Defect reported having taken their Class Vehicles into Subaru dealerships because of the Defect.

87.    Further, upon information and belief, Subaru itself has seen a significant increase in warranty claims relating to the Defect.

88.    Despite its knowledge of the Defect, Subaru failed to disclose it to Plaintiffs and other Class Members.

### E.    Subaru Conceals the Defect and Continues Selling Class Vehicles

89.    Subaru markets its vehicles as safe and reliable. For example, Subaru advertises its Outback models are "made to last so you can rely on [them] no matter where your adventures take you."[11] Subaru further advertises its Outback models with "extra protection … with state-of-the-art active safety technologies" and "reliable and durable Subaru engineering".[12] Subaru also touts that 97% of the vehicles it has sold in the past 10 years are still on the road today.[13]

90.    Subaru easily could have provided Class Vehicle owners and lessees with adequate and satisfactory notice of the Defect, including through its sales and marketing representations, its network of agents and dealers, in owners' manuals, on its website, in Class Vehicle brochures, and on Class Vehicle Monroney stickers. Had Subaru disclosed the Defect in any of these places, reasonable consumers would have been aware of it. But, instead of notifying the consuming public or Class

---

[11] https://www.subaru.com/vehicles/outback/previous-year/index.html (last visited November 24, 2023).
[12] *Id.*
[13] *Id.*

Vehicle owners and lessees of the Defect, Subaru actively concealed this material information from Plaintiffs and similarly situated consumers and continued to sell and lease Class Vehicles.

91.   Despite Subaru's representations of reliability and safety, the Defect renders the vehicles prone to premature failure of the thermo control valve which can ultimately cause engine failure in the Class Vehicles. The Defect prevents the Class Vehicles from working and poses a safety hazard for drivers and their passengers who may be left stranded.

92.   Subaru knew of the Defect before May 2020 because it had begun producing new thermo control valve assembly kits on or before June 2021. Despite continuing to receive numerous consumer complaints about premature thermo control valve failures across its fleet, Subaru continues to design, manufacture, and sell vehicles with the same Defect for years without informing prospective buyers. Nor has Subaru developed an effective fix for the sudden failures the Defect causes.

93.   As a consequence of Subaru's actions and inaction, Class Vehicle owners have been deprived of the benefit of their bargain, lost use of their Class Vehicles for extended periods of time, been exposed to dangerous conditions from being left stranded, and incurred lost time and out-of-pocket costs, including payments for (1) alternative means of transportation such as rideshares or rental cars, (2) roadside assistance to tow their cars, (3) costs for diagnosis, and (4) the costs to

make the necessary repairs. Class Vehicles also have suffered a diminution in value due to the Defect.

94.    Had Plaintiffs and Class Members known about the Defect, they would not have purchased or leased their Class Vehicles or would have paid significantly less in doing so.

## TOLLING OF STATUTES OF LIMITATION

95.    Subaru's knowing and active concealment and denial of the facts alleged herein have tolled any applicable statutes of limitations. Plaintiffs and Class Members could not have reasonably discovered the true facts regarding the Class Vehicles, including the defective nature of vehicles' thermo control valves until shortly before this litigation commenced.

96.    Even after Plaintiffs and Class Members contacted Subaru and/or its authorized dealers for vehicle repairs as a result of the Defect, Subaru routinely informed its customers that the necessary repairs were not covered under warranty.

97.    Subaru was and remains under a continuing duty to disclose to Plaintiffs and Class Members the true facts concerning the Class Vehicles, *i.e.* that the Class Vehicles' thermo control valves suffer from the Defect, and that the existence of the Defect diminishes the intrinsic and resale value of the Class Vehicles and costs consumers an increased expense to replace the thermo control valve in their Class Vehicles. As a result of Subaru's active concealment of the Defect, any and all

applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

## CLASS ACTION ALLEGATIONS

98.    This action is brought and may be maintained as a class action, pursuant to Rules 23(a), (b)(2), (b)(3) and/or (c)(4) of the Federal Rules of Civil Procedure.

99.    The Class is defined as follows:

All persons in the United States who bought or leased a Class Vehicle.

100.   In addition, state subclasses are defined as follows:

**California Subclass**
All persons who bought or leased a Class Vehicle in the state of California.

**Illinois Subclass**
All persons who bought or leased a Class Vehicle in the state of Illinois.

**Missouri Subclass**
All persons who bought or leased a Class Vehicle in the state of Missouri.

101.   Excluded from the Class are Subaru, its affiliates, employees, officers and directors; persons or entities that purchased the Class Vehicles for resale; and the Judge(s) assigned to this case. Plaintiffs reserve the right to modify, change, or expand the class definitions in light of discovery and/or further investigation.

102.   **Numerosity**: The Class is so numerous that joinder of all members is impracticable. While the exact number and identities of individual members of the

Class is unknown at this time, as such information is in the sole possession of Subaru and is obtainable by Plaintiffs only through the discovery process, publicly available sales information shows that Subaru sold or leased hundreds of thousands of each model of Class Vehicles nationwide. Members of the Class can be readily identified based upon, *inter alia*, the records (including databases, e-mails, and dealership records and files) maintained by Subaru in connection with its sales and leases of Class Vehicles.

103. **Existence and Predominance of Common Questions of Fact and Law**: Common questions of law and fact exist as to all members of the Class and predominate over any individual questions. These common legal and factual questions include, but are not limited to:

      a.    whether Subaru engaged in the conduct alleged herein;

      b.    whether Class Vehicles are unfit for their ordinary purpose;

      c.    whether Subaru placed Class Vehicles into the stream of commerce in the United States with knowledge of the Defect;

      d.    whether Subaru knew or should have known of the Defect, and if so, for how long;

      e.    when Subaru became aware of the Defect in the Class Vehicles;

      f.    whether Subaru knowingly failed to disclose the existence and cause of the Defect in the Class Vehicles;

g.      whether Subaru's conduct alleged herein violates consumer protection laws, warranty laws, and other laws as asserted herein;

h.      whether Plaintiffs and Class Members overpaid for their Class Vehicles as a result of the Defect;

i.      whether Plaintiffs and Class Members have suffered an ascertainable loss as a result of their loss of their Class Vehicles' features and functionality;

j.      whether Plaintiffs and Class Members are entitled to damages, including punitive damages, as a result of Subaru's conduct alleged herein, and if so, the amount or proper measure of those damages; and

k.      whether Plaintiffs and Class Members are entitled to equitable relief, including but not limited to restitution and/or injunctive relief.

104.    **Typicality**: Plaintiffs' claims are typical of the claims of the Class because the Plaintiffs purchased or leased a Class Vehicle containing the Defect, as did each member of the Class. Plaintiffs and Class Members sustained economic harm in the same manner by Subaru's uniform course of conduct alleged herein. Plaintiffs and Class Members have the same or similar claims against Subaru relating to the conduct alleged herein, and the same conduct on the part of Subaru gives rise to all the claims for relief.

105.    **Adequacy**: Plaintiffs are adequate representatives of the Class, whose

interests do not conflict with those of any other Class Member. Plaintiffs have retained counsel competent and experienced in complex class action litigation— including consumer warranty and automobile defect class actions—who intend to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

106. **Superiority**: A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiffs and members of the Class. The injury suffered by each individual Class Member is relatively small in comparison to the burden and expense of individual prosecution of these claims, including from the need for expert witness testimony on highly technical and economic issues bound up with the claims. Individualized litigation also would risk inconsistent or contradictory judgments and increase the delay and expense to all parties and the courts. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

107. **Injunctive Relief**: Subaru has acted, and refuses to act, on grounds generally applicable to the Class, thereby making appropriate final equitable relief with respect to the Class as a whole.

## CLAIMS FOR RELIEF

### COUNT I

### Breach of the Implied Warranty of Merchantability
### Plaintiffs, Individually and on Behalf of the Class or,
### Alternatively, the State Subclasses

108. Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

109. Plaintiffs bring this claim individually and on behalf of the Class under New Jersey law. Alternatively, Plaintiffs bring this claim individually and on behalf of their respective state subclasses under the laws of their respective home states.

110. Subaru is a "merchant" as defined under the UCC.

111. The Class Vehicles are "goods" as defined under the UCC.

112. A warranty that the Class Vehicles were in merchantable quality and condition arises by operation of law with respect to transactions for the purchase and lease of Class Vehicles. Subaru impliedly warranted that the Class Vehicles were of good and merchantable condition and quality, fit for their ordinary intended use, including with respect to safety, reliability, operability, and the absence of material defects, and that the vehicles would pass without objection in the automotive trade.

113. The Class Vehicles, when sold and leased, and at all times thereafter, were not in merchantable condition or fit for the ordinary purpose for which vehicles are used. The Class Vehicles were not merchantable in that the Defect renders the vehicle completely inoperable, which may also leave drivers and passengers stranded, unexpectedly, in perilous locations. The Defect therefore renders the Class

Vehicles unfit to provide safe and reliable transportation.

114.  The Defect was present in the Class Vehicles when they were placed into the stream of commerce and inevitably manifests well before the end of the useful life of the vehicles' engine systems.

115.  Subaru was provided notice of the issues complained of herein within a reasonable time by numerous complaints online, directly to Subaru and its authorized dealers, class members taking their vehicle to its dealers, Plaintiffs' demand letters, and the instant lawsuit.

116.  Plaintiffs and the other Class Members have had sufficient direct dealings with either Subaru or its agents, including its authorized dealerships, to establish privity of contract between Subaru on the one hand and Plaintiffs and each Class Member on the other hand. Subaru directly communicated with Plaintiffs and Class Members through its agents, including its authorized dealerships, during the sales process. In addition, Subaru directly communicated with Plaintiffs and Class Members via its television, print, and online advertisements. Subaru also provided it warranties directly to Plaintiffs and Class Members. Plaintiffs and other Class Members relied on Subaru's direct representations regarding the high quality, durability, reliability, dependability, and functionality of Subaru vehicles in making their purchasing decision.

117.  Regardless, privity is not required here because Plaintiffs and each of

the Class Members are the intended third-party beneficiaries of contracts between Subaru and its dealers, and specifically of Subaru's implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles. The warranty agreements, such as the Limited Warranty, were designed for and intended to benefit consumer end-users only. Furthermore, Subaru was aware that the Class Vehicles were ultimately intended for use by consumers such as Plaintiffs and not dealers. Subaru also understood Plaintiffs' and consumers' requirements—including that Class Vehicles would provide reliable transportation, function in a manner that does not pose a safety hazard, and be free from known defects—and expectation that a vehicle manufacturer would disclose any such defects prior to sale. Subaru delivered the Class Vehicles to Plaintiffs and other Class Members to meet those requirements.

118. In its capacity as a supplier and/or warrantor, and by the conduct described herein, any attempt by Subaru to limit its express warranty in a manner that would exclude or limit coverage for the Defect would be unconscionable. Subaru's warranties were adhesive and did not permit negotiations. Subaru possessed superior and exclusive knowledge of the Defect, which is a latent defect, prior to offering Class Vehicles for sale. Subaru concealed and did not disclose this Defect, and Subaru did not remedy the Defect prior to sale (or afterward).

119. As a direct and proximate result of the breach of these warranties, Plaintiffs and Class Members were injured and are entitled to damages.

## COUNT II
### Breach of Express Warranty
### Plaintiffs, Individually and on Behalf of the Class or, Alternatively, the State Subclasses

120. Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

121. Plaintiffs bring this claim individually and on behalf of the Class under New Jersey law. Alternatively, Plaintiffs bring this claim individually and on behalf of their respective state subclasses under the laws of their respective home states.

122. Subaru is a "merchant" as defined under the Uniform Commercial Code ("UCC").

123. The Class Vehicles are "goods" as defined under the UCC.

124. Subaru provides a Limited Warranty and Powertrain Limited Warranty with every Class Vehicle that expressly warrant that Subaru will repair any defects in materials and/or workmanship free of charge during the applicable warranty periods. The Defect is a defect in material and/or workmanship and therefore should have been repaired for free under the Limited Warranty and/or the Powertrain Limited Warranty.

125. Subaru also sells extended warranty plans providing additional warranty coverage of the Class Vehicles' engine and engine components. Because the Defect

is a material and/or workmanship defect in the vehicles' engine systems, the Defect should have been repaired at no cost under these warranty plans.

126. Subaru breached its written warranties by failing to provide an adequate repair when Plaintiffs and the Class Members presented their Class Vehicles to authorized Subaru dealers following manifestation of the Defect. Despite its knowledge that Plaintiffs' and class members' vehicles were exhibiting the symptoms of the Defect, instead of providing an effective repair, Subaru claimed that the necessary repairs to replace the thermos control valve would not be covered under warranty.

127. Subaru failed to perform its written warranty obligations as part of a uniform pattern and practice that extended to all of its dealerships.

128. The warranties formed the basis of the bargain that was reached when Plaintiffs and Class Members purchased or leased their Class Vehicles. Plaintiffs and Class Members experienced the Defect within the warranty period. Despite the existence of the express warranty and multiple repair attempts, Subaru failed to inform Plaintiffs and Class Members of the Defect and failed to adequately repair the Defect.

129. Plaintiffs and the other Class Members have had sufficient direct dealings with either Subaru or its agents, including its authorized dealerships, to establish privity of contract between Subaru on the one hand and Plaintiffs and each

Class Member on the other hand. Subaru directly communicated with Plaintiffs and Class Members through its agents and dealerships. In addition, Subaru directly communicated with Plaintiffs and Class Members via its television, print, and online advertisements. Subaru also issued vehicle warranties directly to Plaintiffs and Class Members. Plaintiffs and other Class Members also relied on Subaru's direct representations regarding the high quality, durability, reliability, dependability, and functionality of Subaru vehicles in making their purchasing decision.

130. Regardless, privity is not required here because Plaintiffs and each of the Class Members are the intended third-party beneficiaries of contracts between Subaru and its dealers, and specifically of Subaru's express warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles. The warranty agreements, such as the Limited Warranty, were designed for and intended to benefit consumer end-users only. Furthermore, Subaru was aware that the Class Vehicles were ultimately intended for use by consumers such as Plaintiffs and not dealers. Subaru also understood Plaintiffs' and consumers' requirements, including that Class Vehicles would provide reliable transportation, that they will function in a manner that does not pose a safety hazard, that they would be free from known defects, and that a vehicle manufacturer would disclose any such defects prior to sale. Subaru delivered the Class Vehicles to Plaintiffs and other Class Members to

meet those requirements.

131.  As a result of Subaru's breach of its express warranty, Plaintiffs and Class Members have suffered economic damages including, but not limited to, the loss of the benefit of their bargain, loss of vehicle use, diminished value, substantial loss in value and resale value, out-of-pocket expenses for maintenance and service expenses to fix the Defect, as well as towing, roadside assistance, and alternative transportation costs that they otherwise would not have incurred but for the Defect.

132.  Subaru was provided notice of the issues complained of herein within a reasonable time by numerous complaints online, directly to Subaru and its authorized dealers, Class Members taking their vehicles to its dealers, Plaintiffs' demand letters, and this lawsuit.

133.  Plaintiffs and Class Members have complied with all obligations under the warranty or otherwise have been excused from performance of such obligations as a result of Subaru's conduct described herein.

134.  In its capacity as a supplier and/or warrantor, and by the conduct described herein, any attempt by Subaru to limit its express warranty in a manner that would exclude or limit coverage for the Defect, including benefit-of-the-bargain, incidental, or consequential damages, would cause the warranty to fail of its essential purpose. Plaintiffs and Class Members have presented their Class Vehicles to Subaru's authorized dealers on numerous occasions and Subaru has

failed to remedy the Defect. As a result, Plaintiffs and Class Members are left with defective vehicles that do not function as intended and, therefore, have been deprived of the benefit of their bargains.

135. In its capacity as a supplier and/or warrantor, and by the conduct described herein, any attempt by Subaru to limit its express warranty in a manner that would exclude or limit coverage for the Defect would be unconscionable. Subaru's warranties were adhesive and did not permit negotiations. Subaru possessed superior knowledge of the Defect, which is a latent defect, prior to offering Class Vehicles for sale. Subaru concealed and did not disclose this Defect, and Subaru did not remedy the Defect prior to sale (or afterward).

## COUNT III
### Violations of the Magnuson–Moss Warranty Act ("MMWA")
### 15 U.S.C. §§ 2301–2312
### All Plaintiffs, Individually and on Behalf of the Class

136. Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

137. Plaintiffs bring this claim on behalf of themselves and the Class.

138. Plaintiffs are "consumers" within the meaning of the MMWA, 15 U.S.C. § 2301(3).

139. Subaru is a "supplier" and "warrantor" within the meaning of the MMWA, 15 U.S.C. § 2301(4)-(5).

140. The Class Vehicles are "consumer products" within the meaning of the

MMWA, 15 U.S.C. § 2301(1).

141.  15 U.S.C. § 2310(d) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

142.  Subaru's express warranties are written warranties within the meaning of the MMWA, 15 U.S.C. § 2301(6). The Class Vehicles' implied warranties are covered under the MMWA, 15 U.S.C. § 2301(7).

143.  Subaru breached its express and implied warranties as described in more detail above. Without limitation, the Class Vehicles contain the Defect that cause the vehicles to be inoperable, which renders the vehicles unfit for their intended use and unsafe. Subaru refused to honor its warranties by repairing or replacing the defective components.

144. Plaintiffs and the other Class Members have had sufficient direct dealings with either Subaru or its agents, including its authorized dealerships, to establish privity of contract between Subaru on the one hand and Plaintiffs and each Class Member on the other hand. Subaru directly communicated with Plaintiffs and Class Members through its agents and dealerships. In addition, Subaru directly communicated with Plaintiffs and Class Members via its television, print, and online advertisements. Subaru also issued vehicle warranties directly to Plaintiffs and Class Members. Plaintiffs and other Class Members also relied on Subaru's direct representations regarding the high quality, durability, reliability, dependability, and

functionality of Subaru vehicles in making their purchasing decision.

145.  Regardless, privity is not required here because Plaintiffs and each of the Class Members are the intended third-party beneficiaries of contracts between Subaru and its dealers, and specifically of Subaru's express and implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles. The warranty agreements, such as the Limited Warranty, were designed for and intended to benefit consumer end-users only. Furthermore, Subaru was aware that the Class Vehicles were ultimately intended for use by consumers such as Plaintiffs and not dealers. Subaru also understood Plaintiffs and consumers requirements, including that Class Vehicles would provide reliable transportation, that they will function in a manner that does not pose a safety hazard, that they would be free from known defects, and that a vehicle manufacturer would disclose any such defects prior to sale. Subaru delivered the Class Vehicles to Plaintiffs and other Class Members to meet those requirements.

146. Plaintiffs and Class Members have afforded Subaru a reasonable opportunity to cure its breach of written warranties, and any further opportunity would be unnecessary and futile here as Subaru has failed to remedy the Defect.

147.  At the time of sale or lease of each Class Vehicle, Subaru knew, should have known, or was reckless in not knowing of its misrepresentations and omissions

concerning the Class Vehicles' inability to perform as warranted, but it nonetheless failed to rectify the situation and/or disclose the Defect. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiffs resort to an informal dispute resolution procedure under the MMWA and/or afford Subaru a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

148.  Plaintiffs and the Class Members would suffer economic hardship if they returned their Class Vehicles but did not receive the return of all payments made by them. Because Subaru is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the other Class Members have not re-accepted their Class Vehicles by retaining them.

149.  The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

150.  Plaintiffs individually and on behalf of the other Class Members, seek all damages permitted by law, including diminution in value of the Class Vehicles, in an amount to be proven at trial.

## COUNT IV
### Violations of the Song–Beverly Consumer Warranty Act
### For Breach of Express Warranty
### Cal. Civ. Code §§ 1790–1795.8
### Plaintiffs Jennifer and John Werthmann, Individually and on Behalf of the California Subclass

151. Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

152. Plaintiffs Jennifer and John Werthmann bring this claim individually and on behalf of the California Subclass.

153. Plaintiffs Jennifer and John Werthmann, and the California Subclass members who purchased or leased the Class Vehicles are "buyers" within the meaning of Cal. Civ. Code. § 1791(b).

154. The class vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

155. Subaru is a "manufacturer" of the Class Vehicles within the meaning of Cal. Civ. Code § 1791(j).

156. Subaru made express warranties to Plaintiffs and the California Subclass members within the meaning of Cal. Civ. Code §§ 1791.2 & 1793.2(d).

157. Subaru breached these express warranties by selling and leasing defective Class Vehicles that required repair or replacement within the applicable warranty period. Despite a reasonable number of attempted repairs, Subaru has failed to adequately repair the Defect.

158. Subaru has failed to promptly replace or buy back the vehicles of Plaintiffs and the proposed California Subclass members as required under Cal. Civ. Code § 1793.2(d)(2).

159. As a direct and proximate result of Subaru's breach of its express warranties, Plaintiffs Jennifer and John Werthmann, and the California Subclass members received goods in a condition that substantially impairs their value to Plaintiffs and the other Subclass members. Plaintiffs Jennifer and John Werthmann, and the California Subclass members have been damaged as a result of, *inter alia*, overpaying for the Class Vehicles, the diminished value of the Class Vehicles, the Class Vehicles' malfunctioning, out-of-pocket costs incurred, and actual and potential increased maintenance and repair costs.

160. Pursuant to Cal. Civ. Code §§ 1793.2 & 1794, Plaintiffs Jennifer and John Werthmann, and the California Subclass members are entitled to damages and other legal and equitable relief, including, at their election, the purchase price of their Class Vehicles or the overpayment or diminution in value of their Class Vehicles as well as reimbursement of out-of-pocket expenses incurred as a result of the Defect.

161. Pursuant to Cal. Civ. Code § 1794(d), (e), Plaintiffs Jennifer and John Werthmann, and the California Subclass members are entitled to reasonable costs and attorneys' fees.

<u>COUNT V</u>
**Violations of the Song–Beverly Consumer Warranty Act**
**For Breach of Implied Warranty**
**Cal. Civ. Code §§ 1790–1795.8**
**Plaintiffs Jennifer and John Werthmann, Individually and on Behalf of the**
**California Subclass**

162. Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

163. Plaintiffs Jennifer and John Werthmann bring this claim individually and on behalf of the California Subclass.

164. Plaintiffs Jennifer and John Werthmann, and the California Subclass members who purchased or leased the Class Vehicles are "buyers" within the meaning of Cal. Civ. Code. § 1791(b).

165. The class vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

166. Subaru is a "manufacturer" of the Class Vehicles within the meaning of Cal. Civ. Code § 1791(j).

167. Subaru impliedly warranted to Plaintiffs Jennifer and John Werthmann, and the California Subclass members that Class Vehicles were "merchantable" within the meaning of Cal. Civ. Code §§ 1791.1(a) & 1792.

168. Section 1791.1(a) provides that: "Implied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods must meet each of the following:

(1) Pass without objection in the trade under the contract description.

(2) Are fit for the ordinary purposes for which such goods are used.

(3) Are adequately contained, packaged, and labeled.

(4) Conform to the promises or affirmations of fact made on the container or label.

169. The Defect in the Class Vehicles is present in them when sold and substantially certain to manifest. The Class Vehicles would not pass without objection in the automotive trade because the Defect causes all or substantially all of the vehicles to experience thermo control valve failure and to fail to operate the engine and cooling system as intended. The Defect thus affects the central functionality of the vehicle and poses a serious safety risk to driver and passenger safety, leading to hundreds to thousands of dollars in repair expenses and inconvenient service calls.

170. Because the Defect creates an unreasonable risk to driver and passenger safety, and because the Defect causes complete loss of power and inoperability, the Class Vehicles are not fit for the ordinary purposes for which such vehicles are used.

171. Class Vehicles are not adequately labeled because the labeling fails to disclose the Thermo Control Valve Defect and does not advise the California Subclass members of this Defect.

172. Any attempt by Subaru to disclaim its implied warranty obligations under the Song-Beverly Act is ineffective due to its failure to adhere to Sections

1792.3 and 1792.4. Those sections of the Civil Code provide that, in order to validly disclaim the implied warranty of merchantability, a manufacturer must "in simple and concise language" state each of the following: "(1) The goods are being sold on an 'as is' or 'with all faults' basis. (2) The entire risk as to the quality and performance of the goods is with the buyer. (3) Should the goods prove defective following their purchase, the buyer and not the manufacturer, distributor, or retailer assumes the entire cost of all necessary servicing or repair." Cal. Civ. Code § 1792.4(a). Subaru's attempted implied warranty disclaimer does not conform to these requirements.

173. The Defect deprived Plaintiffs Jennifer and John Werthmann, and the California Subclass members of the benefit of their bargain and have resulted in Class Vehicles being worth less than what Plaintiffs and other California Subclass members paid.

174. As a direct and proximate result of Subaru's breach of its implied warranties, Plaintiffs Jennifer and John Werthmann, and California Subclass members received goods that contain a defect that substantially impairs their value. Plaintiffs Jennifer and John Werthmann, and the California Subclass members have been damaged by the diminished value of the vehicles, the vehicles' malfunctioning, out-of-pocket costs incurred, and actual and potential increased maintenance and repair costs.

175.  Under Cal. Civ. Code §§ 1791.1(d) & 1794, Plaintiffs Jennifer and John Werthmann, and California Subclass members are entitled to damages and other legal and equitable relief, including, *inter alia*, benefit-of-the-bargain damages, overpayment or diminution in value of their Class Vehicles, and reasonable attorneys' fees and costs.

**<u>COUNT VI</u>**
**Violations of the California Consumers Legal Remedies Act ("CLRA")**
**Cal. Civ. Code §§ 1750–1785**
**Plaintiffs Jennifer and John Werthmann, Individually and on Behalf of the California Subclass**

176.  Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

177.  Plaintiffs Jennifer and John Werthmann bring this claim individually and on behalf of the California Subclass.

178.  Plaintiffs Jennifer and John Werthmann, and the members of the California Subclass are "consumers" as defined under the CLRA. *See* Cal. Civ. Code § 1761(d).

179.  Subaru is a "person" as defined under the CLRA. *See* Cal. Civ. Code § 1761(c).

180.  Class Vehicles are "goods" as defined under the CLRA. *See* Cal. Civ. Code § 1761(a).

181.  The CLRA proscribes "unfair methods of competition and unfair or

deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer." Cal. Civ. Code § 1770(a).

182.  Subaru engaged in unfair and deceptive acts in violation of the CLRA by the practices described above and by knowingly and intentionally concealing from Plaintiffs Jennifer and John Werthmann, and the California Subclass members that the Class Vehicles suffer from the Thermo Control Valve Defect (and the costs, risks, and diminished value of the Class Vehicles as a result of this Defect). Subaru's conduct violated at least the following enumerated CLRA provisions:

a.    Subaru represented that the Class Vehicles have characteristics, uses, or benefits that they do not have, which is in violation of section 1770(a)(5);

b.    Subaru represented that the Class Vehicles are of a particular standard, quality, or grade when, in fact, they are not, which is in violation of section 1770(a)(7);

c.    Subaru advertises its Class Vehicles with the intent not to sell them as advertised, which is in violation of section 1770(a)(9);

d.    Subaru represents that its Class Vehicles have been supplied in accordance with a previous representation when they have not, which is in violation of section 1770(a)(16); and

e.    Subaru inserts an unconscionable provision into its warranty in violation of section 1770(a)(19).

183.  Subaru's unfair or deceptive acts or practices occurred repeatedly in its

trade or business, were capable of deceiving a substantial portion of the purchasing public and created a serious safety hazard for the public.

184.  Subaru knew, should have known, or was reckless in not knowing that the Class Vehicles were defective, would fail prematurely, and were not suitable for their intended use.

185.  Subaru was under a duty to Plaintiffs Jennifer and John Werthmann, and the California Subclass members to disclose the defective nature of the Class Vehicles and the Defect because:

      a.    Subaru knew of but actively concealed the Defect from Plaintiffs and the California Subclass;

      b.    Subaru was in a superior and exclusive position to know the true facts about the Defect, which affects the central functionality of the vehicle and poses safety concerns, and Plaintiffs and the Subclass members could not reasonably have been expected to discover that the Class Vehicles contained the Defect until it manifested, which Subaru knew; and

      c.    Subaru made partial representations regarding the reliability, safety, and quality but suppressed material facts regarding the Defect.

186.  The facts that Subaru misrepresented to and concealed from Plaintiffs Jennifer and John Werthmann, and the other California Subclass members are material because a reasonable consumer would have considered them to be important in deciding whether to purchase their Class Vehicles or pay a lesser price

for them.

187. The Defect poses a serious safety defect and affects the central functionality of a vehicle because it renders the vehicle inoperable.

188. In failing to disclose the material Defect, Subaru has knowingly and intentionally concealed material facts in breach of its duty to disclose.

189. Plaintiffs Jennifer and John Werthmann, and the California Subclass have suffered injury in fact and actual damages resulting from Subaru's material misrepresentations and omissions, including by paying an inflated purchase price for their Class Vehicles and incurring additional out-of-pocket expenses to deal with the Defect. Had Plaintiffs Jennifer and John Werthmann, and the Subclass known about the defective nature of the Class Vehicles and the Defect, they would not have purchased or leased their Class Vehicles or would have paid less in doing so.

190. As a direct and proximate result of Subaru's unfair and deceptive conduct, therefore, Plaintiffs Jennifer and John Werthmann, and the California Subclass members have been harmed.

191. Pursuant to Cal. Civ. Code § 1782(a), Plaintiffs Jennifer and John Werthmann sent a letter to Subaru notifying it of its CLRA violations and providing them with an opportunity to correct their business practices. If Subaru does not correct its business practices, Plaintiffs will amend (or seek leave to amend) the complaint to add claims for monetary relief, including for actual, restitutionary, and

punitive damages under the CLRA.

192. Pursuant to Cal. Civ. Code § 1780(a), Plaintiffs Jennifer and John Werthmann, individually and on behalf of the California Subclass, seek injunctive relief for Subaru's violation of the CLRA.

193. Additionally, pursuant to Cal. Civ. Code §§ 1780 and 1781, Plaintiffs Jennifer and John Werthmann, individually and on behalf of the California Subclass, seeks compensatory and punitive damages under the CLRA and to recover their attorneys' fees and costs.

### COUNT VII
**Violations of the California Unfair Competition Law ("UCL")**
**Cal. Bus. & Prof. Code §§ 17200–17210**
**Plaintiffs Jennifer and John Werthmann, Individually and on Behalf of the California Subclass**

194. Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

195. Plaintiffs Jennifer and John Werthmann bring this claim individually and on behalf of the California Subclass.

196. The UCL proscribes acts of unfair competition, including "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200. Subaru's conduct violates each of these prohibitions.

**Unlawful Conduct**

197.  Subaru's conduct is unlawful, in violation of the UCL, because, as set forth herein, it violates the Song–Beverly Consumer Warranty Act, the MMWA, and the CLRA.

**Unfair Conduct**

198.  Subaru's conduct is unfair because it violated California public policy, legislatively declared in the Song–Beverly Consumer Warranty Act, which requires a manufacturer to ensure that goods it places on the market are fit for their ordinary and intended purposes. The Defect renders the Class Vehicles inoperable.

199.  Subaru acted in an immoral, unethical, oppressive, and unscrupulous manner, in at least the following respects:

  a. Selling Plaintiffs and California Subclass members defective Class Vehicles;

  b. Failing to disclose the Defect despite the opportunity to do so in numerous locations that people in the market for a vehicle would be likely to encounter;

  c. Directing and furnishing replacement parts it knew would not adequately remedy the defect, and repairing defective parts with more defective parts and otherwise failing to adequately remedy the Defect during the warranty period;

  d. Refusing to repair or replace the Class Vehicles when the known Defect manifested outside the warranty period;

  e. Failing to exercise adequate quality control and due diligence

over the Class Vehicles before placing them on the market; and

f.  Failing to acknowledge the scope and severity of the Defect, which poses serious safety concerns, refusing to acknowledge the Class Vehicles are defective, and failing to provide adequate relief to Plaintiffs and California Subclass members.

200. The gravity of the harm resulting from Subaru's unfair conduct outweighs any potential utility of the conduct. The practice of selling defective Class Vehicles without providing an adequate remedy to cure the Defect harms the public at large and is part of a common and uniform course of wrongful conduct.

201. There are reasonably available alternatives that would further Subaru's business interests of increasing sales and preventing false warranty claims. For example, Subaru could have: (a) acknowledged the Defect and provided a permanent, effective fix for the Defect; and/or (b) disclosed the Defect prior to prospective consumers' purchases.

202. The harm from Subaru's unfair conduct was not reasonably avoidable by consumers. The Class Vehicles all suffer from the Defect, and Subaru has failed to disclose it. Plaintiffs Jennifer and John Werthmann, and California Subclass members did not know of, and had no reasonable means of discovering, the Defect.

**Fraudulent Conduct**

203. Subaru's conduct is fraudulent in violation of the UCL. Subaru's fraudulent acts include knowingly and intentionally concealing from Plaintiffs

Jennifer and John Werthmann, and the California Subclass members the existence of the Defect and falsely marketing and misrepresenting the Class Vehicles as being functional and not possessing a defect that would render them inoperable.

204. Subaru's misrepresentations and omissions alleged herein caused Plaintiffs and the California Subclass members to purchase or lease their Class Vehicles or pay more than they would have had Subaru disclosed the Defect.

205. At all relevant times, Subaru had a duty to disclose the Defect because it had superior and exclusive knowledge of the Defect, which affects the central functionality of the vehicle and creates a safety risk for drivers and passengers, and because Subaru made partial representations about the reliability, quality, and safety of the Class Vehicles but failed to fully disclose the Defect.

206. Accordingly, Plaintiffs Jennifer and John Werthmann, and California Subclass members have suffered injury in fact, including lost money or property, as a result of Subaru's unlawful, unfair, and fraudulent acts. Absent these acts, Plaintiffs Jennifer and John Werthmann, and California Subclass members would not have purchased or lease their Class Vehicles at the prices they paid or would not have purchased or leased them at all.

207. Plaintiffs Jennifer and John Werthmann seek appropriate relief under the UCL, including such orders as may be necessary: (a) to enjoin Subaru from continuing its unlawful, unfair, and fraudulent acts or practices, and (b) to restore

Plaintiffs and California Subclass members any money Subaru acquired by its unfair competition, including restitution. Plaintiffs also seeks reasonable attorneys' fees and expenses under applicable law.

**<u>COUNT VIII</u>**
**Violations of the Illinois Consumer Fraud and Deceptive Business Practices Act**
**815 Ill. Comp. Stat. § 505/1 *et seq.* ("ICFA")**
**Plaintiff Beuttel, Individually and on Behalf of the Illinois Subclass**

208. Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

209. Plaintiff Beuttel brings this claim individually and on behalf of the Illinois Subclass.

210. Plaintiff Beuttel and Illinois Subclass members are "consumers" within the meaning of 815 Ill. Comp. Stat. § 505/1(e).

211. Plaintiff Beuttel, Illinois Subclass members, and Subaru are "persons" within the meaning of 815 Ill. Comp. Stat. § 505/1(c).

212. Subaru engages in "trade" or "commerce" within the meaning of 815 Ill. Comp. Stat. § 505/1(f).

213. Subaru engages in the "sale" of "merchandise" as those terms are defined by 815 Ill. Comp. Stat. § 505/1(b) and (d).

214. The ICFA prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of

any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . in the conduct of any trade or commerce." 815 Ill. Comp. Stat. § 505/2.

215.  Subaru's acts and practices, described herein, are unfair and deceptive in violation of Illinois law. By selling defective Class Vehicles with exclusive or superior knowledge of the defect, and by failing to disclose the defect or honor warranty claims in good faith, Subaru acted unscrupulously in a manner that is substantially oppressive and injurious to consumers. Subaru owed a duty to disclose all material facts concerning the Class Vehicles and the Defect because it possessed exclusive or superior knowledge, intentionally concealed material information from consumers, and/or made misrepresentations that were rendered misleading because they were contradicted by facts that were withheld.

216.  Subaru committed these unfair and deceptive acts and practices with the intent that consumers, such as Plaintiff Beuttel and Illinois Subclass members, would rely upon Subaru's misrepresentations and omissions when deciding whether to purchase a Class Vehicle.

217.  Plaintiff Beuttel and Illinois Subclass members suffered ascertainable loss as a direct and proximate result of Subaru's unfair and deceptive acts and practices. Had Plaintiff Beuttel and Illinois Subclass members known that the Class

Vehicles are defective, they would not have purchased a Class Vehicle, or would have paid significantly less for one. Among other injuries, Plaintiff Beuttel and Illinois Subclass members overpaid for their Class Vehicles and their Class Vehicles suffered a diminution in value.

218.  Accordingly, pursuant to 815 Ill. Comp. Stat. § 505/10a(a), Plaintiff Beuttel and the Illinois Subclass seek actual compensatory, and punitive damages (pursuant to 815 Ill. Comp. Stat. § 505/10a(c)), injunctive relief, and reasonable attorneys' fees and costs.

### COUNT IX
**Violations of the Missouri Merchandising Practices Act**
**(Mo. Rev. Stat. § 407.010 *et seq.*)**
**Plaintiff Austermann, Individually and on Behalf of the Missouri Subclass**

219.  Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

220.  Plaintiff Austermann brings this claim individually and on behalf of the Missouri Subclass.

221.  Plaintiff Austermann, Missouri Subclass members, and Subaru are "persons" under the MMPA and Class Vehicles are "Merchandise" under the MMPA. Mo. Rev. Stat. § 407.010.

222.  The MMPA prohibits the act, use, or employment of "deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment,

suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce[.]" Mo. Rev. Stat. § 407.020. Subaru's conduct described herein is deceptive, fraudulent, and unfair in violation of the MMPA. Specifically, Subaru failed to disclose material facts to Plaintiff Austermann and Missouri Subclass members concerning the Thermo Control Valve Defect, made misleading partial representations regarding the quality of Class Vehicles without disclosing the entire truth, failed to exercise adequate quality control and due diligence over the Class Vehicles before placing them on the market, and refused to acknowledge the scope and severity of the Defect, which poses safety concerns.

223.    Plaintiff Austermann and Missouri Subclass members purchased their Class Vehicles for personal purposes and suffered ascertainable losses of money or property as the result of the use or employment of a method, act or practice declared unlawful by Mo. Rev. Stat. § 407.020. Plaintiff Austermann and Missouri Subclass members acted as reasonable consumers would have acted under the circumstances. Subaru's deceptive, fraudulent, and unfair conduct would cause a reasonable person to purchase or lease Class Vehicles resulting in damages.

224.    Accordingly, pursuant to Mo. Rev. Stat. § 407.025, Plaintiff Austermann and Missouri Subclass members are entitled to recover their actual damages, which can be calculated with a reasonable degree of certainty using

sufficiently definitive and objective evidence. Those damages are: (a) the difference between the values of the Class Vehicles as represented in the prices Plaintiff and Missouri Subclass members paid and their actual values at the time of purchase, or (b) the cost to repair and/or replace the defective thermo control valves, as well as (c) other miscellaneous incidental and consequential damages.

225.   Pursuant to Mo. Rev. Stat. § 407.025, Plaintiff Austermann and Missouri Subclass members also seek punitive damages and recovery of attorneys' fees and costs, as well as other equitable relief, such as a buy back of the Class Vehicles.

226.   In accordance with Mo. Rev. Stat. § 407.025, a copy of this Complaint will be served on the Attorney General of Missouri.

## COUNT X
### Fraudulent Concealment
### All Plaintiffs, Individually and on Behalf of the State Subclasses

227.   Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

228.   Plaintiffs bring this claim, under the laws of their respective home states, individually and on behalf of their respective State Subclasses.

229.   Subaru made material omissions concerning a presently existing or past fact in violation of common law. Subaru did not fully and truthfully disclose to its customers the true nature of the Thermo Control Valve Defect. A reasonable

consumer would not have expected the Defect in a new vehicle and especially not a Defect that rendered the vehicle inoperable, presenting a danger to drivers and passengers.

230. Subaru made these omissions with knowledge of their falsity and with the intent that Plaintiffs and Class Members rely upon them.

231. The facts concealed, suppressed, and not disclosed by Subaru to Plaintiffs and Class Members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase or lease Class Vehicles at all or at the offered price.

232. Subaru had a duty to disclose the true quality and reliability of the Class Vehicles because the knowledge of the Defect and its details were known and/or accessible only to Subaru; Subaru had superior knowledge and access to the relevant facts; and Subaru knew the facts were not known to, or reasonably discoverable by, Plaintiffs and Class Members. Subaru also had a duty to disclose because it made many affirmative representations about the qualities and reliability of its vehicles, including references as to safety and general operability, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual reliability of their vehicles.

233. Had Plaintiffs and the Class known about the defective nature of the Class Vehicles, they would not have purchased or leased the Class Vehicles or would

have paid less in doing so. Thus, Plaintiffs and the other Class Members were fraudulently induced to lease or purchase Class Vehicles containing the Defect.

234. Plaintiffs and Class Members reasonably relied on Subaru's material omissions and suffered damages as a result. Subaru's conduct was willful, wanton, oppressive, reprehensible, and malicious. Consequently, Plaintiffs and Class Members are entitled to an award of punitive damages.

**COUNT XI**
**Unjust Enrichment**
**In the Alternative to Plaintiffs' Claims at Law**
**All Plaintiffs, Individually and On Behalf of the State Subclasses**

235. Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

236. Plaintiffs bring this claim, under the laws of their respective home states, individually and on behalf of their respective State Subclasses.

237. This claim is pleaded in the alternative to the other claims set forth herein.

238. Plaintiffs lack an adequate remedy at law.

239. As the intended and expected result of its conscious wrongdoing, Subaru has profited and benefited from the purchase and lease of Class Vehicles that contain the Defect.

240. Subaru has voluntarily accepted and retained these profits and benefits, knowing that, as a result of its misconduct alleged herein, Plaintiffs and the Class

were not receiving Class Vehicles of the quality, nature, fitness, reliability, safety, or value that Subaru had represented and that a reasonable consumer would expect. Plaintiffs and the Class Members expected that when they purchased or leased a Class Vehicle, it would not contain a Defect that renders the vehicle inoperable and unreliable and poses a serious safety risk.

241. Subaru has been unjustly enriched by its deceptive, wrongful, and unscrupulous conduct and by its withholding of benefits and unearned monies from Plaintiffs and the Class rightfully belonging to them.

242. Equity and good conscience militate against permitting Subaru to retain these profits and benefits from its wrongful conduct. They should accordingly be disgorged or placed in a constructive trust so that Plaintiffs and Class Members can obtain restitution.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and all other similarly situated, request that this Court enter an Order against Subaru providing for the following:

> A.    Certification of the proposed Class and/or Subclasses, appointment of Plaintiffs and their counsel to represent the Class, and provision of notice to the Class;

> B.    An order permanently enjoining Subaru from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

C.   Injunctive relief in the form of a recall or free replacement program;

D.   Equitable relief, including in the form of buy back of the Class Vehicles;

E.   Costs, restitution, damages, including punitive damages, penalties, and disgorgement in an amount to be determined at trial;

F.   An Order requiring Subaru to pay pre- and post-judgment interest as provided by law;

G.   An award of reasonable attorneys' fees and costs as permitted by law; and

H.   Such other or further relief as may be appropriate.

## <u>JURY DEMAND</u>

Plaintiffs hereby demand a trial by jury for all claims so triable.

Dated: November 24, 2023          Respectfully submitted,

By:   */s/ Matthew D. Schelkopf*
Matthew D. Schelkopf (030362002)
Joseph B. Kenney (085582013)
**SAUDER SCHELKOPF LLC**
1109 Lancaster Avenue
Berwyn, Pennsylvania 19312
Telephone: (888) 711-9975
Facsimile: (610) 421-1326
mds@sstriallawyers.com
jbk@sstriallawyers.com